Gary Lee **FISHER**, Petitioner–Appellee,

v.

**Ernest C. ROE, Warden; Attorney General of the State of California, Respondents–Appellants.**

**Michael Collins, Petitioner–Appellee,**

v.

**Theo White, Warden, Respondent–Appellant.**

Nos. 00–55031, 00–55035.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 10, 2001

Filed Aug. 27, 2001

---

Adrianne S. Denault, Attorney General's Office, San Diego, California, for the respondents-appellants.

Monica Knox, Federal Public Defender's Office, Los Angeles, California, for the petitioners-appellees.

Before: TROTT, THOMAS, and BERZON, Circuit Judges.

TROTT, Circuit Judge:

## OVERVIEW

Gary Fisher and Michael Collins were convicted in California state court in 1992, of murder. Ernest Roe and Theo White, the wardens of the prisons in which Fisher and Collins are incarcerated, appeal the district court's order granting Fisher and Collins writs of habeas corpus. The appellees' petitions for federal habeas relief were based on a single incident alleged to have occurred at their joint trial: a readback during the jury's deliberations of supposedly critical testimony, without the knowledge or participation of the defendants and their attorneys. The district court granted Fisher and Collins relief on the ground that the readback from which they were excluded had violated their right to "a fair and just hearing—and thus to due process—" during a critical stage of the trial. The wardens challenge this order, arguing that 1) the district court's factual findings were clearly erroneous, 2) the right to be present at a readback of testimony is not "clearly established" by Supreme Court precedent, as required by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d)(1) ("AEDPA"), and 3) any constitutional error that may have occurred was harmless. We have jurisdiction of this timely appeal pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 2253, and we affirm.

## BACKGROUND

### A. Underlying Facts and Procedural History

Because the repugnant facts relating to the underlying crime are not essential to the issue at hand, we will describe them only briefly. On October 29, 1991, at around 10:00 p.m., Bryant Powell was shot and killed at the Foothill Villas apartment complex in San Bernardino, California, under circumstances strongly indicating retaliatory gang activity. Two security officers from Foothill Villas testified that they had observed Fisher and Collins in the complex shortly before the murder took place, and one of these officers testified that he saw Fisher fire a shot. Fisher and Collins then took off in a white pickup truck, and the security officers followed. Although the officers lost sight of the truck during the high-speed chase that ensued, they eventually caught up with Fisher and Collins at a duplex apartment not far from the site of the shooting.

Fisher and Collins were arrested there for Powell's murder.

Fisher and Collins were tried jointly and presented an alibi defense. Five defense witnesses testified that Fisher and Collins had been at the houses of various friends and relatives between 9:00 and 10:20 p.m. on the night of the murder, and had only arrived at the duplex where they were arrested shortly before the officers arrived. Despite this testimony, both men were found guilty.

While reviewing, after his conviction, the court clerk's trial minutes, Fisher noticed to his surprise that the jury had at one point during deliberations requested a readback of testimony. Claiming that the readback occurred without their knowledge or consent, both Fisher and Collins filed habeas petitions in the California Supreme Court, asserting that their federal constitutional right to be present and represented by counsel at trial had been violated because they were excluded from the readback, and because the trial judge had failed to supervise the process. These petitions were denied without explanation in one-sentence orders.

Having thus exhausted their state remedies, Fisher and Collins filed federal habeas petitions, alleging that their rights to due process were violated because they, their attorneys, and the trial judge were absent from and had no control over the readback proceedings.[1] The district court granted these petitions, and the wardens now appeal.

## B. Evidence Before the District Court Relating to the Readback

Fisher and Collins presented to the district court the following evidence regarding the readback. The court clerk's minute order for their trial indicated that a readback of testimony occurred on February 7, 1992, the second day of deliberations. That minute order indicates that the court reporter entered the jury room twice to conduct a readback, for a total time of about one hour. The minute order also indicates that the second time the reporter entered the jury room, she conducted a "partial readback." The body of the minute order does not contain any reference to the court, the prosecutor, the defense attorneys, or the defendants.

To flesh out the implications of the minute order, Fisher and Collins presented evidence that neither they nor their lawyers knew that the readback took place. Each petitioner submitted a personal declaration stating that he had no knowledge of the readback until long after the trial was over. Although Fisher's trial lawyer died shortly after the trial, Collins's lawyer, John Kearney, also declared that he was never informed that the jury had requested a readback. Alleging that he had a present memory of the specific events of the trial, Kearney recalled that he and Fisher's lawyer were awaiting the verdicts at a restaurant near the courthouse, and that they were never contacted by court personnel regarding a readback. Kearney also declared that it was his practice to routinely go to the courthouse when a jury requested a readback "to make sure the

---

1. Fisher's case has an unusual procedural history. Fisher had previously filed a federal habeas petition in 1994 alleging that he had not been present at the readback. The evidence gleaned from that case makes up the bulk of the record in the present one. It was at the evidentiary hearing for the first federal petition that the trial judge's absence from the

readback proceedings became clear. Fisher then added the claim that the judge had failed to control the readback to his petition, but the district court determined that he had not exhausted his state remedies as to that claim, and dismissed the case. At that point, Collins joined Fisher in petitioning the California Supreme Court for habeas relief.

jury listens to both sides and not some skewed perspective of the witnesses' direct testimony only."

Of the jurors, apparently only the foreman, James Handgis, had any useful concrete recollection of the readback. He testified during an evidentiary hearing that the jury reached a point in its deliberations where the majority of the jurors had reached a decision, but two or three people wanted to make absolutely certain that their notes regarding the sequence of events were correct. Handgis said these jurors wanted to verify that the defendants could have gotten from the crime scene to the place where they were arrested in the time frame described by the prosecution witnesses. Handgis referred to the time sequence as "the only iffy issue" and "the big issue" in the case.

Handgis further testified that the jury contacted the bailiff and told him that they wanted to see the court reporter. When the court reporter appeared, the jury told her that they wanted to hear the testimony "from this point to this point," from the time Fisher and Collins "left the scene of the crime to when they were apprehended." Handgis testified that the court reporter told the jury that she would have to "get the stuff and put it together 'cause it was kind of a lot.'" When the court reporter returned, she read back the testimony until the jury told her it had heard enough.

Neither the court reporter nor any court personnel had any recollection whatsoever of this readback. The court reporter testified at the evidentiary hearing, but could recall nothing specific. She did, however, testify that it was not her normal procedure to read testimony back to a jury without first obtaining authorization of the judge. Similarly, the trial court bailiff declared that he had no memory of the events in question, but that he would never tell a court reporter to read back testimo-

ny without first obtaining approval of the judge. In a recorded telephone conversation with counsel for Fisher and Collins and the wardens, the trial judge stated the he had no recollection of the readback. He did, however, indicate that he would not allow a readback to occur without his authorization or the consent of both attorneys. However, because the trial judge did not make these statements under oath, the attorney general successfully objected to them, and the conversation was not officially entered into the record in this case. Hence, the district court did not consider it as evidence.

Other than the nonspecific testimony of James Handgis, the record contains no indication of what the jury did, or did not, review.

Based on this showing, the district court concluded that "it is simply incontrovertible that something went wrong and regular procedures were not followed." Noting that "respondents do not contend that either the petitioners or their lawyers were notified before the readback," the court made the following specific findings of fact:

1. Fisher and Collins and their attorneys were never informed that the jury had requested a readback.

2. The court reporter decided when to stop reading testimony based on the reaction of the jurors.

3. The trial court failed to control the readback.

The court determined that these facts amounted to a denial to the defendants of a record of what transpired before the jurors during their review of "the big issue." The district court then concluded that habeas relief was warranted based on the uninformed and unwaived exclusion of the defendants and their attorneys from the readback proceedings.

## DISCUSSION

### A. Standard of Review

■ We review *de novo* a district court's decision to grant or deny a state prisoner's petition for habeas relief. *Bribiesca v. Galaza*, 215 F.3d 1015, 1018 (9th Cir.2000). The district court's factual findings, however, are reviewed for clear error. *Henry v. Kernan*, 197 F.3d 1021, 1026 (9th Cir.1999).

### B. Analysis

#### 1. The District Court's Factual Findings Are Not Clearly Erroneous.

■ This case graphically illustrates one of the bread and butter principles of appellate review that governs the manner in which we measure the work of a trial court. Trial courts find facts. We do not. Because the witnesses never appear in person before us, we are in no position to assess or to judge their credibility. Thus, we will not disturb a district court's findings of fact unless we are left with the definite and firm conviction that a mistake has been made. *Sawyer v. Whitley*, 505 U.S. 333, 346 n. 14, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). "If the [trial court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Phoenix Eng'g and Supply Inc. v. Universal Elec. Co.*, 104 F.3d 1137, 1141 (9th Cir.1997) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Hence, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Cree v. Flores*, 157 F.3d 762, 768 (9th Cir.1998). *See also* FED. R. CIV. P. 52(a) (stating that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous[.]").

■ Unfortunately, many lawyers who come before us do not fully appreciate the height of the hurdle they must clear when attempting to convince us that a fact found by the trial court was clearly erroneous. The Sixth Circuit attempted to convey in more earthy terms the arduousness of this endeavor in *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.:*

> To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must, as one member of this court recently stated during oral argument, strike us as wrong with the force of a five-week old, unrefrigerated dead fish.

866 F.2d 228, 233 (7th Cir.1988).

The wardens' attempt to convince us of the actionable stench of the district court's factual findings boils down to this:

1. The bailiff's alleged regular practice of always consulting the trial judge about readbacks, although he could not remember anything about particulars of this case.

2. The trial judge's court clerk's sworn declaration that her readback routine was always to contact counsel, but that she could not remember what she did here.

3. The court reporter's sworn declaration that her practice was always to take her cue from the judge although, once again, she had no precise memory of this prosecution.

4. A claim that Kearney's declaration was based not on a positive recollection that the notification did not happen, but on no recollection that it did.

5. The presumption of regularity in the state court proceeding.

■ Moreover, the wardens claim that in turning away the petitioners' state habeas petitions without any explanation whatsoever, the California Supreme Court made "implied" findings of fact entitled to deference pursuant to 28 U.S.C. §§ 2254(d) and 2254(e)(1). We conclude that the wardens' case, although not implausible, falls far short of demonstrating clear error. A thorough review of the record reveals that the district judge's findings that the readback took place without notice to the defendants and their lawyers is clearly supported by the sworn declarations of people in an excellent position to know whether this contention was true—the defendants and the surviving lawyer. Measured by the appropriately deferential standard of review, it cannot be said that the court personnel's collective non-recollection and reliance on their usual routine necessarily impeaches the petitioners' account of what occurred and renders the district court's findings clearly erroneous.

Noticeably missing from the clerk's otherwise very precise trial minutes is any reference during the readback to the presence or notification of the defendants or counsel. Likewise conspicuous by its absence is any word from the prosecutor, R. Haight, as to his memory of the events. We note also that because of the attorney general's successful objection to information from the trial judge himself, the record contains no evidence from the bench. The attorney general's objection blocked from the evidentiary record the judge's heated statement that he could "never do any readback without the consent of both attorneys." This void undercuts the attorney general's argument that we must rely on the presumption of regularity in that the record contains no evidence from the key person in this equation—the judge—as to what the regular procedure was. Hence, the attorney general's case has been impoverished by this omission. By winning the battle of the tactical objection, the overarching war effort was impaired. As the district court noted, Fisher and Collins have clearly overcome any such presumption of regularity with relevant and probative evidence.

Finally, we reject the wardens' unconvincing suggestion that the California Supreme Court's seven word denial of the habeas petitions contained an "implicit" factual finding that the readback occurred in the presence of the defendants. As we explain in Part 2.b., such a rote denial contains no findings of fact, and is therefore entitled to no deference on that ground. Thus, we are left with a case where the operative facts to which we must attach legal significance are as follows: 1) no notice, 2) no presence, 3) no representation by counsel, 4) no waiver, and 5) no control by the court of the readback procedure.

**C. Whether the Readback in the Absence of Defendants and Their Attorneys Violated Rights Clearly Established by the Supreme Court**

**1. Applicability of AEDPA**

■ Because Fisher and Collins filed their petitions in 1997, they are subject to the provisions of AEDPA, and in particular to 28 U.S.C. § 2254(d)(1), which mandates substantial deference to the decisions of state courts. Section 2254(d)(1) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as de-

termined by the Supreme Court of the United States[.]

Thus, we may not grant habeas relief simply because the California Supreme Court's disposition of the case was inconsistent with our own precedent. *See, e.g., Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir.2000). While our own precedent and that of other courts is not irrelevant, *see id.,* we must nonetheless focus primarily on Supreme Court cases to determine whether Fisher and Collins are entitled to relief.

### 2. Effect of California Supreme Court's "Postcard Denial"

 Thickening the plot even further is the California Supreme Court's unexplained resolution of Fisher's and Collins's case: "Petition for writ of habeas corpus denied." In *Delgado v. Lewis,* 223 F.3d 976, 981–82 (9th Cir.2000), we were confronted with a similar "postcard denial" from the California Supreme Court. We held that in reviewing such unexplained state court orders, we must conduct "an independent review of the record ... to determine whether the state court clearly erred in its application of controlling federal law." *Id.* at 982. Thus, while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law.

### 3. Applicable Supreme Court Cases

 Although no Supreme Court cases perfectly address the extent of a defendant's right to participate in the process of reading back testimony to a jury, the Court has held that a criminal defendant is entitled "to be present from the time the jury is impaneled until its discharge after rendering the verdict." *Shields v. United States,* 273 U.S. 583, 589, 47 S.Ct. 478, 71

L.Ed. 787 (1927); *see also Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987); *United States v. Gagnon,* 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985); *Snyder v. Massachusetts,* 291 U.S. 97, 105–106, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *cf. Rushen v. Spain,* 464 U.S. 114, 117–118, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (assuming defendant's absence from meeting between judge and juror was error but holding that it could be harmless).

 Refining this broad rule in a case involving a defendant's claim to a right to be present while the jury silently visited the scene of the crime, the Court stated that a defendant has a right to be present and participate if his presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder,* 291 U.S. at 105–106, 54 S.Ct. 330. "So far as the Fourteenth Amendment is concerned, the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence and to that extent only." *Id.* at 107–108, 54 S.Ct. 330. However, the Fourteenth Amendment does not require the defendant's presence where "presence would be useless, or the benefit but a shadow." *Id.* at 106–107, 54 S.Ct. 330. The Court concluded in *Snyder* that the defendant's absence from this procedure did not violate his constitutional rights.

### 4. Application of Supreme Court Law to the Facts

 The Supreme Court has thus set forth a working constitutional standard by which to evaluate whether a defendant has a right to participate in a particular proceeding. This standard is clearly established and has been since 1987 at the

latest. We must therefore determine whether the California Supreme Court's determination that Fisher and Collins were not entitled to relief was "contrary to" or "an unreasonable application of" that clearly established law. 28 U.S.C. § 2254(d)(1).

■ Because the Supreme Court has never specifically addressed the question of whether a defendant has a right to participate in a readback of testimony, the California Supreme Court's disposition of this case cannot be precisely "contrary to" Supreme Court precedent. However, as the Court has recently clarified, the fact that a state court decision does not directly contradict a factually indistinguishable Supreme Court case does not automatically insulate the state decision from federal habeas review pursuant to AEDPA. *See Williams v. Taylor*, 529 U.S. 362, 402–408, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Rather, a state court decision may represent an unreasonable application of Supreme Court precedent if, for example, it "unreasonably refuses to extend [an established legal principle] to a new context where it should apply." *Id.* at 398, 120 S.Ct. 1495.

■ We have recently interpreted this language from *Williams*. In order to determine a state court decision's reasonableness or unreasonableness, we use a "clearly erroneous" standard. *See Van Tran*, 212 F.3d at 1153–54. A state court decision will be clearly erroneous if a careful review of the record and the applicable case law leaves us with the "firm conviction" that the state court was wrong. *See id.* Looking closely at the facts of this case in light of the applicable case law, it is apparent that the California Supreme Court's denial of the petitions was clear error.

According to clearly established Supreme Court case law, Fisher and Collins had a right to be involved in and present at the readback if their absence could have undermined the fairness of the proceedings. *See Snyder*, 291 U.S. at 107–108, 54 S.Ct. 330. It is indisputable that their absence, and that of their attorneys, greatly increased the risk of prejudice. If present and participating, Fisher and Collins or their lawyers could have made certain, where appropriate, that testimony of defense witnesses was read as well as that of the state's witnesses. They could also have ensured that any cross-examination of prosecution witnesses would be read in addition to direct testimony. They could also have made certain that the court reporter's notes were accurate, that her notes accurately reflected the witnesses' testimony, and that she did not unduly emphasize any part of the requested testimony or use any improper voice inflections. Finally, they could have created for review on appeal a clear record of what occurred.

Moreover, this was a critical readback request designed specifically to review the petitioners' defense to the charges. The jury did not simply ask to hear the testimony of a single witness, or to have a few isolated facts verified. Rather, the jurors apparently wanted to hear a substantial part of the prosecution's case over again, the testimony from "where the pursuit initiated to where [Fisher and Collins] were apprehended." Given the breadth of this request, the input of the defendants and their lawyers as to how to best deal with the request may have been vital. Under these circumstances, to say that the defendants could have gained nothing by being present or represented by counsel at the readback, or that their "presence would be useless, [and] the benefit but a shadow," *Snyder*, 291 U.S. at 106–07, 54 S.Ct. 330, would be unreasonable.

The fact that in *Snyder, Stincer,* and *Gagnon,* the Supreme Court ultimately

concluded that the respective defendants in those cases had *no* right personally to be present does not hinder these petitioners. In each of these cases, at least one defense attorney was present at the proceeding from which the defendant was excluded. *See Stincer,* 482 U.S. at 747, 107 S.Ct. 2658 (defendant could gain nothing by being present at a hearing to determine competency of child witness where his lawyer was present and he himself had no independent knowledge of the child's ability to testify); *Gagnon,* 470 U.S. at 525–26, 105 S.Ct. 1482 (defendants had no right to be present at *in camera* hearing to discuss a juror's concern that one defendant had been sketching members of the jury and to determine whether that juror could remain impartial; counsel for one defendant was present, and presence of defendants at such a hearing would have been counterproductive); *Snyder,* 291 U.S. at 102–111, 54 S.Ct. 330 (defendant had no right to be present when jury viewed scene of the crime; his presence could have contributed nothing where, among other things, his lawyer was present). Moreover, in each case, a contemporaneous record of the proceedings made clear that nothing untoward occurred. *See Stincer,* 482 U.S. at 744–46, 107 S.Ct. 2658; *Gagnon,* 470 U.S. at 523–24, 105 S.Ct. 1482; *Snyder,* 291 U.S. at 103–05, 54 S.Ct. 330.

The case at bar is clearly different. The attorneys for Fisher and Collins were just as unaware of the readback proceedings as the defendants. No record was made of the readback proceedings, thus making it impossible to say definitively, or even speculatively, that nothing prejudicial occurred. In these respects, the present case has more in common with *Shields,* in which neither the defendant nor his attorney was present when the court gave supplemental instructions, than it does with *Snyder, Stincer,* and *Gagnon.* While it makes perfect sense to conclude that the presence of the defendant would be largely a matter of form when a defendant's lawyer is present at proceedings raising largely legal issues, when the lawyer is also absent and uninformed, the matter becomes a problem of constitutional substance.

Our recent decision in *LaCrosse v. Kernan,* 244 F.3d 702 (9th Cir.2001), is not to the contrary. In *LaCrosse,* we held broadly that the right personally to be present at a readback of testimony is *not* "clearly established" according to Supreme Court jurisprudence. *Id.* at 707. We stated that "other courts have declined to recognize this right" and that "[g]iven the divergence of opinion on this issue and the lack of clear guidance from the United States Supreme Court," the right to be present at a readback is not clearly established, and habeas relief not warranted. *Id.*

However, there is a critical and dispositive difference between *LaCrosse* and the present case: LaCrosse's attorney not only was aware of the readback procedure proposed by the judge, but the attorney was consulted by the court and agreed to the proposed procedure and stipulated that his client need not be present. Here, of course, the district court found that the readback occurred not only in the absence of the defendants and their lawyers, but without their knowledge and participation. In short, they had been completely and unilaterally excluded from that part of the trial. These distinctive facts demonstrate that *LaCrosse* does not provide us with the answer in this case.

Cases of other courts which have held that a defendant has no right personally to be present at a readback are distinguishable on similar grounds, and therefore do not alter the conclusion that the right to be present at a readback under these circumstances is a clearly established right. As with the cases discussed above, many cases declining to recognize a defendant's right to be personally present at a read-

back involved situations in which the defendant's counsel was present. *See, e.g., Valdez v. Gunter,* 988 F.2d 91, 92–94 (10th Cir.1993); *United States v. Sobamowo,* 892 F.2d 90, 96 (D.C.Cir.1989) (Ginsburg, R. Bader, J.). Finally, many of the cases that refused to reverse convictions even if a defendant *and* his attorney were absent seem to conflate the issue of whether error occurred with whether the error was harmless. *See, e.g., United States v. Holton,* 116 F.3d 1536, 1545–46 (D.C.Cir.1997); *United States v. Florea,* 541 F.2d 568, 571 (6th Cir.1976); *People v. White,* 144 Mich. App. 698, 376 N.W.2d 184 (1985). Additionally, in *Holton,* the defense counsel had notice of the tape playback, 116 F.3d at 1540, 1545, and in *Florea,* the court found that there was "the practical equivalent of a stipulation by counsel that the court could permit the tapes to be replayed before the jury in counsel's absence." 541 F.2d at 571. Given the fact-sensitive nature of the inquiry as to whether a defendant's rights will be adversely affected by his absence from a particular proceeding, we are neither bound nor instructed by the fact that other courts have held, under materially different circumstances, that a defendant's rights were not violated by his absence from a readback.

Finally, although not essential to the analysis, our own cases holding that a defendant has a constitutional right to be present at a readback bolster this conclusion. *See, e.g., Hegler v. Borg,* 50 F.3d 1472, 1478 (9th Cir.1995); *Bustamante v. Eyman,* 456 F.2d 269, 271–73 (9th Cir. 1972). Moreover, we have reversed convictions and said that a trial judge abuses his discretion if he fails to take measures to present a balanced view of testimony when a jury requests a readback. *See, e.g., United States v. Hernandez,* 27 F.3d 1403, 1409 (9th Cir.1994) (district court abused its discretion where it allowed jury to re-read transcript of critical testimony without admonishing jury that it must

weigh all evidence and not rely solely on the transcripts). This case shows that had Fisher and Collins and their lawyers been present to help determine the scope of the readback, their suggestions could not have fallen on deaf ears.

### 5. Conclusion

In light of the unique facts of this case, Supreme Court cases, and our own precedent, we conclude under AEDPA that the California Supreme Court's denial of the petitions was an unreasonable application of clearly established federal constitutional law. The district court's thoughtful decision in this regard was correct.

### D. Prejudice

A defendant's absence from readback proceedings is properly characterized as trial error, rather than structural error, and is therefore subject to constitutional harmless error review. *See Hegler,* 50 F.3d at 1477; *see also Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (generally discussing difference between trial errors, which are amenable to harmless error review, and structural errors, which defy such analysis and are considered prejudicial *per se* ). However, a state, as the beneficiary of an identifiable error, must be able to affirmatively show that it was harmless. *See O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). Because this case is on collateral review, the wardens need only show that the error did not have "a substantial and injurious effect or influence in determining the jury's verdict," a somewhat lower standard than is applicable on direct review. *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Despite this some-

what lower standard, if, after reviewing the record, we remain in "grave doubt" as to whether the error was harmless, we must grant Fisher and Collins relief. *See O'Neal,* 513 U.S. at 436, 115 S.Ct. 992.

 As indicated earlier, an inquiry here is materially hampered by the total lack of a record of what happened during the readback. To quote the wardens' brief, "It is unknown what testimony was read back to the jury during deliberations," and, "It is also unknown the total number of witnesses' testimony which was read back." We have read the trial transcript and agree that it does not aid us in this inquiry.

As one might expect, and as revealed by the foreman's testimony in district court, the jurors were interested in the critical issue in the case raised by the defense in an attempt to create reasonable doubt:

Q (The Court) Now, if you could for the Court, describe in as much detail as possible what the full extent of the testimony that you requested read back, just a summarization if you can, if you can recall.

A (The Foreman) Again, it was, it was just the, the sequence of events, the big, the big issue that, that the panel wanted to verify was to make sure that their notes were accurate as far as the time frame. They wanted to make sure, according to all the testimony that was available, the issue, if there was one that remained, was just saying that, could these guys have gotten from here to here and in the, you know, figuring what the distance was off of the map, and such, 'cause I know we had a map available, and the mileage and stuff like that. And they were said to have been going at certain rates of speed, and this and that and so on and so forth.

So, all it was was just saying, okay, could they have gotten here? I mean, could they, could they actually be there?

Q Now, you just stated that from all the testimony available. Does that mean that you heard testimony from more than one witness that testified at trial?

A Uh huh, uh huh.

Q Do you recall approximately, how many witnesses testimony were reviewed by the jury during the read back?

A Let's see, there was the detective, the police officer—at least one of the police officers. There was a relative, as I—one or two relatives of his. I would say, half a dozen. Maybe, there might have been a few more. If you include, like the, the security guards that, or the security guard, I don't know if both of them—to, you know, as far as the initial time, so yeah, there was, I guess at least six or so, maybe more.

Finally, the trial record and the district court record do not shed any light on whether the court reporter unduly emphasized any particular testimony, either by failing to read cross examination or through improper voice inflections.

Given this set of circumstances, this case appears to be one of the rare situations in which a review of the record leaves us at the least in "virtual equipoise" as to whether the error had a substantial and injurious effect or influence on the jury's verdict. *See O'Neal,* 513 U.S. at 435, 115 S.Ct. 992. Accordingly, Fisher and Collins must be granted relief. *Id.*

AFFIRMED.