No. 2--02--0430 

__________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

DU PAGE COUNTY BOARD OF REVIEW, )  Appeal from the Circuit Court

                                )  of Du Page County.

Plaintiff-Appellant,       ) 

                                ) 

v.  )  No. 01--MR--266                                                 )           

THE DEPARTMENT OF REVENUE OF    )

THE STATE OF ILLINOIS and GOOD  )

SHEPHERD EVANGELICAL LUTHERAN   )

CHURCH,                         )  Honorable 

) Bonnie M. Wheaton,

Defendants-Appellees.      )  Judge, Presiding. 

_________________________________________________________________

JUSTICE GROMETER delivered the opinion of the court:

Plaintiff, the Du Page County Board of Review (Board), appeals a judgment affirming a decision by the Department of Revenue of the State of Illinois (Department) granting a tax exemption for real property owned by Good Shepherd Evangelical Lutheran Church (Good Shepherd or the church).  The Board contends that the Department erred insofar as it held that a house for one of the church's schoolteachers is exempt under section 15--40 of the Property Tax Code (35 ILCS 200/15--40 (West 1998)).  We agree.  Therefore, we affirm in part and reverse in part.

On May 11, 1999, Good Shepherd, a member of the Wisconsin Evangelical Lutheran Synod, bought land improved with a detached garage and a house.  The land is near the church's other property.  On August 13, 1999, the church petitioned the Department to exempt its new property from taxation for 66% of the 1999 tax year.  The Board contested the petition.  We summarize the evidence from the hearing before the administrative law judge (ALJ).

Good Shepherd's first witness was Erik Guldberg, the president of its congregation.  He testified as follows.  When the congregation wishes to "call" a new teacher, it obtains a list of candidates from the synod.  The voters' assembly then chooses a candidate, and the church sends her a "call letter."  On March 8, 1999, the church sent a letter to Ellen Zank, "solemnly charg[ing]" her to instruct her students in "the chief truths of the Word of God[]" and otherwise to follow Christian principles.  Also, the letter requires Zank to assist as the school's athletic director and to conduct the vacation Bible school.  In return, the church promises to receive Zank as "a servant of Jesus Christ," to treat her accordingly, and (more mundanely) to pay her salary and provide her housing.    On May 10, 1999, the congregation voted to require Zank to live in the house.

David Rutschow, Good Shepherd's senior pastor, testified that the "ministry" includes both the church and the school.  He stated that "we're calling [pastors and teachers] to the ministry of our congregation, whether it be preaching or whether it be teaching ministry."  A synod yearbook for 2001 lists Zank among the "Women in the Teaching Ministry."  

A letter Rutschow wrote his attorney in August 2000 explains that the church calls pastors to the "preaching ministry" and teachers to the "teaching ministry."  The teachers must instruct students in the standard secular subjects and in the Bible. Teachers must teach all subjects and administer all discipline in the light of the Bible. 

The synod operates Martin Luther College in Minnesota, which trains pastors and teachers, both of whom are "presented to the church as candidates for the ministry" and receive their initial assignments from the synod.  Teachers and pastors are called by the method Guldberg described.

Rutschow recounted that, on August 8, 1999, Zank was installed during a church service.  The installation was conducted according to a form entitled "A Rite of Installation/Ordination of Teachers."  Zank professed her faith in scripture and promised that her teaching would follow the appropriate religious doctrines. 

Ellen Zank testified as follows.  At Martin Luther College, she received religious education but no pastoral training.  She arrived at Good Shepherd a month before her installation.  Zank teaches kindergarten through second grade.  Good Shepherd's teachers teach "all the subjects that you would find in any other school" and do so "in the light of God's word."  Zank teaches specifically religious subjects an hour each day.  She is the athletic director and helps with vacation Bible school.  

Zank uses one of the two bedrooms in her house as a "school office," where she grades papers and does teaching-related work.  However, the house is never used for meetings or other school activities.  Unlike Zank, the principal and the other teachers reside in private homes.

The Board called David Rutschow.  Asked why only Zank lives in church-owned housing, Rutschow replied that the other teachers already had their residences and that "we had a single teacher previously who left us through death ***---she had been housed in an apartment because she was a single teacher."  The congregation had paid this teacher's rent.  Were Zank not living in the church-owned house, the congregation would give her a reasonable housing allowance.  There were nearby apartment houses that the congregation believed were safe and well run.

The ALJ recommended exempting the property at issue under section 15--40, which at the pertinent time read:

"All property used exclusively for religious purposes, or used exclusively for school and religious purposes, or for orphanages and not leased or otherwise used with a view to profit, is exempt, including all such property owned by churches or religious institutions or denominations and used in conjunction therewith as housing facilities provided for ministers *** performing the duties of their vocation as ministers at such churches or religious institutions or for such religious denominations ***.

A parsonage, convent or monastery or other housing facility shall be considered under this Section to be exclusively used for religious purposes when the church *** requires that the above listed persons who perform religious 
related activities shall, as a condition of their employment or association, reside in the facility."  35 ILCS 200/15--40 (West 1998).

The ALJ concluded that the house is used exclusively for a religious purpose because (1) Zank's "call" requires her to live there; and (2) Zank performs many of her job duties there.  The ALJ did not decide whether the house is exempt as a housing facility for a "minister."  The ALJ also held that the detached garage is exempt because it is reasonably necessary for the church to store church-related property there.    

The Department adopted the ALJ's recommendation.  The circuit court affirmed, although on the ground that the house was the residence of a "minister."  The Board appeals.  

The Board does not contest the exemption for the detached garage.  However, it claims that Zank's home is not tax-exempt.  The Board argues that because the facts are undisputed, the exemption issue is a question of law to be reviewed 
de novo
.  According to the Board, the Department erred as a matter of law in concluding that the house is "used exclusively for religious purposes" (35 ILCS 200/15--40 (West 1998)), as the house is primarily a residence.  The Department responds that even though the facts are not in dispute, the Department's decision should not be reversed unless it is clearly erroneous--which, of course, in the Department's view, it is not.

We first address whether the Department's decision should be reviewed 
de novo
 or deferentially.  The Board's assertion that this appeal raises an issue of law, to be reviewed 
de novo
, is  inherently plausible.  Generally, whether a given set of historical facts satisfies a given constitutional or statutory standard 
is
 considered a question of law subject to 
de novo
 review.  See, 
e.g.
, 
People v. Sims
, 192 Ill. 2d 592, 615 (2000) (whether given facts supply probable cause);
 
People v. Lamborn
, 185 Ill. 2d 585, 590 (1999) (whether given photograph meets statutory definition of "lewd"); 
In re Marriage of Hughes
, 322 Ill. App. 3d 815, 818-19 (2001) (whether facts reflect "substantial change of circumstances" under child-support statute).  
Indeed, such was long the rule in property tax exemption cases.  In 1996, our supreme court stated, "Where facts are undisputed, *** whether property is exempt from taxation is a question of law."  
Chicago Patrolmen's Ass'n v. Department of Revenue
, 171 Ill. 2d 263, 271 (1996).

However, we agree with the Department that the supreme court has rewritten the rules for reviewing administrative agencies' decisions and has overruled the cited passage from 
Chicago Patrolmen's Ass'n
.  See 
Carpetland U.S.A., Inc. v. Illinois Department of Employment Security
, 201 Ill. 2d 351, 368-69 (2002).  Under the new dispensation, whether given historical facts satisfy an established legal rule is a "mixed question of law and fact," and an agency's resolution of that question must stand unless it is "clearly erroneous."  
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 392-93 (2001); 
City of Belvidere v. Illinois State Labor Relations Board
, 181 Ill. 2d 191, 205 (1998).  This rule of deference rests in part on agencies' experience and expertise in interpreting their governing statutes.  
AFM
, 198 Ill. 2d at 394-95.  The "clearly erroneous" test applies to Department rulings in property tax exemption cases.  
Swank v. Department of Revenue
, 336 Ill. App. 3d 851, 860-61 (2003). 

What the "clearly erroneous" test actually means in this context--what it requires a court of review to do--is perhaps ill-defined.  Positing the existence of a "continuum" between 
de novo
 review of issues of law and deferential "manifest weight" review of factual issues, the supreme court has called "clearly erroneous" an "intermediate standard of review" providing "somewhat less deference" to the agency than that given on purely factual questions.  
Carpetland U.S.A.
, 201 Ill. 2d at 369.  Yet the court  has said that a decision is "clearly erroneous" only if we are  " 'left with the definite and firm conviction that a mistake has been committed.'[Citation.]"  
AFM
, 198 Ill. 2d at 395.  This suggests that the test is essentially reducible to reasonableness and is thus, for all practical purposes, as deferential as the "manifest weight" test used for purely factual issues.   

Additionally, the court has modeled the "clearly erroneous" test on the similar federal standard for reviewing purely factual findings.  
AFM
, 198 Ill. 2d at 393-95.  Yet the federal standard is extremely deferential.  To be "clearly erroneous," a circuit court's finding must be " 'more than just maybe or probably wrong; it must *** strike us as wrong with the force of a five-week old, unrefrigerated dead fish.' "  
Fisher v. Roe
, 263 F.3d 906, 912 (9th Cir. 2001), quoting 
Parts & Electric Motors, Inc. v. Sterling Electric, Inc.
, 866 F.2d 228, 233 (7th Cir. 1988).  Thus, the meaning of "clearly erroneous" appears to be elusive, even considering that we cannot expect mathematical precision from verbal formulae.

Furthermore, it is not clear what practical difference the new test actually makes.  It appears that in 
Carpetland
, 
AFM
, and 
Belvidere
, the court did what it had done before under the 
de novo
 standard--apply its precedents to the facts at hand to decide whether the agency's decision followed the pertinent statutes and case law.  If traditional 
de novo
 review is the only way that a reviewing court can ascertain whether a mistake has been committed, then nothing has really changed.  However, 
AFM
 and 
Belvidere
 may aim to give the courts the last word on general questions of law while allowing an agency to "legislate" in a particular case where judicial precedent does not dictate the outcome.
(footnote: 1)  This follows from the rule that agencies' interpretations of their governing statutes deserve some deference.  See 
AFM
, 198 Ill. 2d at 394-95. 

Fortunately, we can decide this case without resolving these theoretical and practical difficulties.  Whatever the "clearly erroneous" test means, it cannot mean that an agency may flout established case law.  We believe that the Department's decision is inconsistent with established case law.  Thus, it must be reversed.

Under the first paragraph of section 15--40, Zank's house is tax-exempt if (1) it is "used exclusively for religious purposes" or (2) "used exclusively for school and religious purposes."  35 ILCS 200/15--40 (West 1998).  The Department ruled that the house is "exclusively used for religious purposes."  We must infer that the Department also implicitly held that the house is used "exclusively for school and religious purposes," as Zank uses part of the house as an office where she grades papers and performs other teaching duties.

Under the second paragraph of section 15--40, the house is exempt if Zank lives there as a condition of her employment (which she does) 
and
 she is one of the "above listed persons" who perform religion-related activities.  35 ILCS 200/15--40 (West 1998).  The "above listed persons" include ministers.  Curiously, although the record is replete with references to Zank's membership in the "teaching ministry" and evidence that her teaching duties include religious instruction, the Department did not decide whether she is a "minister" under section 15--40.  Although the trial court did so rule, that is irrelevant because we review the decision of the agency, not the judgment of the trial court.  See 
Calabrese v. Chicago Park District
, 294 Ill. App. 3d 1055, 1065 (1998).  Because the Department did not rule on this possible ground for a tax exemption, we shall not decide the issue. 

We are left with one issue: whether the house is exclusively used for religious purposes or school and religious purposes.  We hold that it is not.

The five-room house is primarily a place for Zank to live.  Only one room, the bedroom that serves as Zank's office, is used for school or religious purposes.  No school or religious functions take place on the property.  Although Zank's contract (her call) requires her to live in the house, the evidence does not establish that the nature of her duties requires her to reside there.  The other teachers and the principal live in private housing.  Reverend Rutschow's testimony does suggest obliquely that the church may have bought the house out of concern for Zank's safety.  However, this testimony is unclear at best, and the church never argued that it felt such a need to provide church-owned housing for Zank.  Also, Rutschow's testimony equally suggests that Zank could have been housed in reasonably safe and appropriate private lodgings. 

Under these circumstances, this case cannot be distinguished from others in which courts have denied tax exemptions.  In 
St. John Evangelical Lutheran Congregation v. Board of Appeals
, 357 Ill. 69 (1934), the plaintiff church operated a parochial school and sought a tax exemption for a residence occupied rent-free by one of the school's teachers.  The supreme court held that the residence was not used exclusively for religious purposes or exclusively for school and religious purposes (see Ill. Rev. Stat. 1933, ch. 120, par. 2) even though students occasionally received tutoring there.  Although the house was used partly for school or religious purposes, its primary use was as a residence.  Thus, it was analogous to parsonages, which, at that time, were not tax-exempt.  
St. John
, 357 Ill. at 71.

In 
People ex rel. Kelly v. Avery Coonley School
, 12 Ill. 2d 113 (1957), a private school sought tax exemptions for two apartment buildings, one of which housed its headmistress and principal custodian and the other of which was a residence for unmarried teachers.   The school argued that the first building helped the headmistress and the custodian carry out their functions and saved the school money, while the second alleviated the shortage of suitable housing for unmarried teachers.  The court held that neither building was used exclusively for school purposes (see Ill. Rev. Stat. 1955, ch. 120, par. 500) because "the primary use of the property, and not its incidental uses, has fixed its status for taxing purposes.  Here, as in the cases cited, the residential use is primary; other uses are incidental."  
Avery Coonley School
, 12 Ill. 2d at 116.

In 
MacMurray College v. Wright
, 38 Ill. 2d 272 (1967), two colleges sought tax exemptions for housing for faculty and staff members.  The supreme court denied the exemptions, holding that the  residences were not used exclusively for school purposes (see Ill. Rev. Stat. 1965, ch. 120, par. 500.1).  The property was not exempt merely because it was school-owned and school personnel lived there; the schools had to prove that the housing was used primarily for purposes that were reasonably necessary to carry out the schools' purposes.  However, there was no showing that having faculty and staff live in the residences was reasonably necessary to carrying out their educational duties or that they performed these duties there.  Thus, the residential use of the property was primary; the educational use was secondary.  As a result, the property was not exempt.  
MacMurray College
, 38 Ill. 2d at 278-79.

This case is indistinguishable from the earlier cases.  As in 
St John
, 
Avery Coonley School
, and 
MacMurray College
, the property at issue is used 
primarily
 as a residence and only secondarily for school or religious purposes.  Although Zank's employment agreement requires her to live in the house, her job duties do not make it reasonably necessary for her to do so.  Other teachers live in private housing, and the church could have made the same arrangement for Zank.  It was not reasonably necessary to the church's function to provide Zank with church-owned housing.  Therefore, the house is not tax exempt. 

We affirm the grant of a tax exemption for the detached garage.  We reverse the grant of a tax exemption for the rest of the property at issue.

The judgment of the circuit court of Du Page County is affirmed in part and reversed in part.

Affirmed in part and reversed in part.

BOWMAN and BYRNE, JJ., concur.

FOOTNOTES
1:
Thus, the "legislative" function of the agency 
vis-a-vis
 the courts could resemble the legislative function of the courts 
vis-a-vis
 the legislature, 
i.e.
, the agencies "do and must legislate, but they can do so only interstitially; they are confined from molar to molecular motions."  
Southern Pacific Co. v. Jensen
, 244 U.S. 205, 221, 61 L. Ed. 1086, 1100, 37 S. Ct. 524, 531 (1917) (Holmes, J., dissenting).