William L. GRAY, Petitioner–
Appellant,

v.

Joseph KLAUSER, Warden,
Respondent–Appellee.

No. 00–35732.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 7, 2001

Filed Feb. 27, 2002.

Maynard D. Grant, Grant & Newcomb, Seattle, WA, for the petitioner-appellant.

Kenneth M. Robins, Deputy Attorney General, Boise, ID, for the respondent-appellee.

Before: LAY,[*] TROTT, and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Idaho state prisoner William Gray was convicted of killing his wife, Betty Gray, and her friend, Reeda Roundy. Gray unsuccessfully sought relief in the Idaho state court system before filing a habeas petition in federal court pursuant to 28 U.S.C. § 2254. The district court denied the petition but granted a certificate of appealability for each of Gray's claims. Because we find that the Idaho trial court's ("trial court") rulings regarding the admission of hearsay evidence violated Gray's constitutional rights and that the requisite harmless error standard was met, we reverse.

## I. Facts

On July 24, 1989, LeRoy Leavitt went to the Idaho Falls, Idaho home of Reeda Roundy. There, he found Roundy and Betty Gray, Roundy's best friend and Leavitt's lover, dead from gunshot wounds to the head. After more than two years of investigation of four suspects, the government indicted Betty Gray's husband of 29 years, William Gray, for the murders and a related burglary count.

### A. The State's Theory

According to the state, after learning that Betty Gray was having an affair with Leavitt and that she wanted a divorce, Gray hatched a plan to kill his wife and took steps to ensure that he would not get caught: First, Gray bought a 1971 International Travelall and registered it under a false name. Then, in the early morning hours of July 24, 1989, Gray drove the Travelall from his home in Jackson Hole, Wyoming, to the Eastern Idaho Medical Center in Idaho Falls, Idaho. Gray parked the Travelall at the Medical Center, and then rode his bicycle 3.6 miles to Roundy's home, where Betty Gray had spent the night.

At Roundy's home, the government claimed, Gray shot both Betty Gray and Roundy in the head with a 9mm handgun. The prosecution theorized that Gray arranged the scene to appear as the site of a ritualistic cult killing, hoping to deflect suspicion from himself. Then, Gray rode the bike 3.6 miles back to the medical center and drove the Travelall back to

[*] The Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation.

Jackson Hole. There was also evidence that Gray initially lied during the investigation as to several matters, including whether he owned a vehicle similar to the Travelall, why, and what happened to it.

## B. The Defense

Gray's defense consisted of two related claims: that he was not the murderer and that someone else was. Regarding the claim that he was not the murderer, Gray asserted that he was not in Idaho Falls on the night in question. He testified also that he did not know about Betty Gray's affair with Leavitt until after the murders. Gray emphasized that the State had no fingerprints linking him to the crimes, and that the State produced little other physical evidence. Moreover, Dr. Karen Servilla, Gray's treating physician, opined that because of his poor medical condition, Gray was physically unable to ride his bicycle the 7.2 mile round-trip in the time theorized by the government. Gray also explained that he had bought the Travelall for someone else as part of his pawnshop business, although that person was never found.

The second part of Gray's defense posited that somebody else was the real killer, and Gray pointed in several directions. Aside from emphasizing the ritualistic overtones of the crime scene, Gray postulated that one of three people—Leavitt, Houston Riley (Roundy's current lover), or J.W. Dyer (Roundy's previous lover)—was responsible for the murders.

## C. The Photo Line-up

The key to the state's case was Steve Mackley, a security guard at the Eastern Idaho Medical Center. Around 3:00 a.m. on July 24, 1989, Mackley saw a middle-

aged man ride a bicycle into the medical center parking lot and put the bicycle into a vehicle with Wyoming license plates. In statements to the police, Mackley described the vehicle variously as a Jeep, as a "Suburban-type" vehicle, and as perhaps an International.

Suspicious, Mackley approached the man and questioned him. The parking lot was dark, Mackley told the jury, but he scanned a flashlight beam over the man's face. For approximately sixty seconds Mackley spoke with a middle-aged Caucasian man with rosy red cheeks who was sweating profusely and was out of breath. The man, who wore a medical identification bracelet and glasses, told Mackley that he was picking up the vehicle for friends from Jackson Hole, Wyoming.

After news of the murders spread, Mackley contacted the police and told them what he had seen. When asked to help a police artist create a composite sketch of the mystery man, Mackley fairly accurately described Gray with one significant exception: he claimed that the man with whom he had spoken was clean-shaven, stating "No mustache, no beard, or anything." Gray was sporting a full beard on the night in question.

Three days later, when the police showed him a five-person photographic line-up,[1] Mackley selected the bearded Gray, stating that "the person I remember to a tee was in photograph 3 [Gray]." Because he was "concerned" about the facial hair, however, Mackley asked the police how recently the photograph had been taken.

Then, a few days later, Mackley coincidentally ran into Gray at a hospital, and immediately identified Gray as the man

---

1. Actually, the photograph array consisted of six photos. Mackley acknowledged that he knew the person in photograph 6.

from the medical center parking lot with the bicycle and Travelall. As Mackley put it: "The facial hair didn't throw me off again, because I'd seen it in the picture."

Gray sought to prevent the state from introducing Mackley's statements identifying Gray as the mystery bicycle-rider. Gray argued that the manner in which the photographic array was arranged called attention to Gray and thus was unduly suggestive. In the array, Gray's picture is the only one with a dark pink tint; also, only Gray and one other man are shown wearing glasses. That other man is wearing sunglasses while Gray is depicted looking out over the top of reading glasses, a characteristic Mackley had noted regarding the person he saw. Gray contended that for these reasons and others, the array was unduly suggestive, and that the identifications were fruits of that unduly suggestive line-up. The trial court rejected Gray's argument, finding that the array was not unduly suggestive, and that even if it was, Mackley's identifications were sufficiently reliable to be admitted. The Idaho Court of Appeals found the array to be unduly suggestive, but held that Mackley's identification was "sufficiently reliable to outweigh the low level of suggestiveness in the identification procedures." *State v. Gray*, 129 Idaho 784, 798, 932 P.2d 907, 921 (Ct.App.1997). The federal district court in its decision on habeas review tracked the reasoning of the state appeals court.

## D. The Hearsay Evidence

At trial, both sides sought to present hearsay evidence in order to advance their respective theories of the case. Through the testimony of Betty Gray's sister, Joann Buccola, the state sought to introduce hearsay statements made by Betty Gray that, by supplying Gray with a motive, made it appear more likely that he was the killer. Likewise, the defense attempted to introduce hearsay statements made by Roundy, through the testimony of Roundy's two children, her best friend, and Riley, the man who was her lover at the time of her death. These statements made it appear more likely that Roundy's former lover, Dyer, was the killer, as he had threatened and stalked Roundy.

Over Gray's objections, the trial court allowed the state to introduce some of Betty Gray's hearsay statements. Before so ruling, the trial court held a pre-trial suppression hearing to consider the admissibility of these statements. Buccola testified at that hearing about several conversations she had with her deceased sister.[2] Following the hearing, the trial court ruled that the state could not introduce Betty Gray's statement that she feared her husband, because the statement was not material. The court did, however, allow Buccola to testify at trial that Betty Gray said that she was having an affair and wanted a divorce, that Gray had learned about the affair and desire for divorce, that Gray had asked her to keep it secret, and that Gray became angry when she divulged the secret. The trial court concluded that one of these statements (that Betty Gray told Gray she wanted a divorce) was not hearsay, and that the rest were relevant statements of fact that bore particularized guarantees of trustworthiness and thus were admissible under Idaho's residual exception to the hearsay rule, IDAHO R. EVID. 803(24) ("Rule 803(24)").

The trial court did not, however, allow Gray to introduce any of the hearsay statements attributable to Roundy. Roundy's

---

**2.** The reason the prosecution gave for presenting Buccola as a live witness before the judge was that the statements she testified to were different in some ways from those contained in the government's prehearing written submissions.

statements indicated, first, that she was afraid of Dyer, and, second, the reasons for her fear, including that Dyer had stalked her, that he had threatened to kill her, and that the police had told her that Dyer was a "mercenary." [3] The trial court first ruled that these statements could not come in under Idaho's state of mind hearsay exception, IDAHO R. EVID. 803(3) ("Rule 803(3)"). It reasoned—as it did with regard to similar statements by Betty Gray—that the statements relating to Roundy's state of mind were immaterial and thus inadmissible. It then held that the reasons for Roundy's fear were statements of fact, and thus did not qualify for admission under the state of mind hearsay exception.

The trial court next considered the admissibility of Roundy's statements under Idaho's residual hearsay exception, Rule 803(24). Here, the trial court held once again that because the statements relating to Roundy's state of mind were not material, they were inadmissible. As to the statements that indicated the factual reasons for Roundy's state of mind, the trial court held that because they failed to qualify for admission under Idaho's state of mind hearsay exception, they also did not qualify for admission under Idaho's residual hearsay exception.[4] In two oral rulings during trial, the trial court repeated this reasoning.

### E. Proceedings

Following trial, the jury returned a verdict of guilty on two counts of first degree murder and one count of first degree burglary. Gray appealed to the Idaho Court of Appeals, which affirmed. *Gray*, 129 Idaho

784, 932 P.2d 907. Gray then filed a petition for review with the Idaho Supreme Court, and, after it was denied, a petition for Writ of Certiorari with the United States Supreme Court, also denied.

Gray filed a timely petition for habeas relief. Gray and respondent Joseph Klauser, the warden of the Idaho State Correctional Institution, filed cross summary judgment motions. The district court granted the warden's motion and denied Gray's. Gray now appeals that ruling.

## II. ANALYSIS

Gray raises four issues in this appeal. He argues that the photo line-up procedure was so suggestive that it denied his constitutionally-protected right to due process. He raises a second due process issue, claiming that the trial court failed to poll all jurors regarding prejudicial midtrial publicity. Gray claims, thirdly, that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment by admitting the hearsay statements of Betty Gray. Finally, Gray argues that the trial court violated his due process rights by suppressing hearsay statements made by Roundy. We address these contentions in turn.

### A. The Photographic Line-up

 Assuming—without deciding—that the five-person photo array was somewhat suggestive, we are convinced that under the circumstances Mackley's eyewitness identification was sufficiently reliable to have been presented to the jury. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v.*

---

**3.** The record does not elaborate on the definition of "mercenary" except to say that Dyer was "a military-involved individual, who owns a sporting goods store ... with access to numerous weapons."

**4.** The trial court's rulings on this question are described in more detail, *infra*, where we discuss the hearsay admissibility issue on the merits.

*Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In determining whether an eyewitness' identification is sufficiently reliable to outweigh the suggestiveness of a photo array, we consider, among other things: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his prior description; (4) the level of certainty demonstrated at the identification; and (5) the length of time between the crime and the identification. *Brathwaite,* 432 U.S. at 114, 97 S.Ct. 2243.

Mackley had a fairly good opportunity to view the mystery bicycle rider. He spoke with the man at close range for approximately sixty seconds. Although it was dark, Mackley scanned a flashlight beam across the man's face several times.

Mackley's degree of attention was relatively high. An onduty security guard at the time of the encounter, his attention was piqued because he suspected that the man was illegally siphoning gas or hot-wiring a car.

Mackley's pre-line-up description was accurate in several ways. Mackley described the person in the parking lot as a Caucasian, middle-aged man, with flushed cheeks and a ruddy complexion, who wore glasses and a medical identification bracelet. Each description matched Gray. Also, Mackley accurately described the International Travelall vehicle with fair accuracy, including its Wyoming license plates.[5] However, the fact that Mackley remembered the man as clean-shaven, while Gray had a significant beard, appreciably undercuts the accuracy of his description. *See Tomlin v. Myers,* 30 F.3d 1235, 1241–42 (9th Cir.1994) (questioning the accuracy of an identification where witness stated perpetrator had a "two-inch afro" and defendant had a "shoulder-length straightened permanent hair style").

Mackley was fairly sure at the photo line-up that Gray was the man he had encountered in the medical center parking lot. He stated that Gray was "the person I remember to a tee." Mackley was concerned, however, about Gray's facial hair, and asked when the photo was taken.

Finally, the time between Mackley's encounter with the mystery bicycle-rider and his selection of Gray at the photo line-up was short: three days.

Under these circumstances, there is not "a very substantial likelihood of irreparable misidentification [, and] [s]hort of that point, such evidence is for the jury to decide." *Brathwaite,* 432 U.S. at 116, 97 S.Ct. 2243 (internal quotation and citation omitted).

## B. Juror Polling

Upon Gray's request, the trial court polled the jury members about their exposure to potentially adverse mid-trial publicity. In his brief to this court, Gray argued, as he had on appeal in the state courts and in the federal district court on habeas, that the trial judge inadvertently bypassed one juror and that this failure denied him his right to an impartial jury. The state appeals court and the district court accepted the factual representation but held that there was no error of constitutional dimensions. As Gray's appellate counsel acknowledged during oral argument, however, a careful reading of the transcript shows that the trial judge *did* poll each of the twelve jurors and two alternates. There was no error.

---

**5.** Mackley vacillated somewhat before and during trial in describing the precise color of the vehicle, its brand, and the manner in which the tailgate operated.

## C. Betty Gray's Hearsay Statements

■ Gray challenges the trial court's decision to allow some of Betty Gray's out-of-court statements under Idaho's residual hearsay exception, Rule 803(24), as violative of Gray's Sixth Amendment right to confront witnesses. When a declarant is unavailable to testify, the Confrontation Clause countenances hearsay only if it demonstrates adequate indicia of reliability either by (1) falling within a firmly rooted hearsay exception; or (2) bearing particularized guarantees of trustworthiness. *See Idaho v. Wright*, 497 U.S. 805, 815, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Idaho's residual hearsay exception, under which the challenged statements were admitted, is not a firmly rooted hearsay exception. *Id.* at 817, 110 S.Ct. 3139. The question raised by Gray's Sixth Amendment challenge, consequently, is whether Betty Gray's statements admitted under the residual hearsay exception bore particularized guarantees of trustworthiness.

The government presented the testimony of Buccola as to the situational background of Betty Gray's statements. As the federal district court observed, the trial court engaged in precisely the process that the Supreme Court has suggested is necessary to determine the trustworthiness of hearsay statements and thereby protect the defendant's rights under the Confrontation Clause. *Id.* at 818–20, 110 S.Ct. 3139. Moreover, the trial court found trustworthiness on the basis of some of the factors that the Supreme Court has approved as particularized guarantees of trustworthiness, including spontaneity, consistent repetition, state of mind, and lack of motive to fabricate (although not all of the statements admitted had all these characteristics). *Id.* We conclude that the trial court's inquiry into the trustworthiness preceding the introduction of Betty Gray's hearsay statements, while truncat-ed in some respects, was sufficient under *Wright* to preclude a violation of the Confrontation Clause.

## D. Roundy's Hearsay Statements

The trial court did commit a different constitutional error, though, in connection with its decision to admit Betty Gray's hearsay statements. Although the court admitted her statements, which favored the government's position, it refused to admit parallel hearsay statements by Roundy. In these statements, Roundy indicated that Dyer had threatened her life and stalked her. Had the court applied the reasoning used to exclude Roundy's statements to Betty Gray's statements, it would have excluded those statements as well.

■ This asymmetrical application of evidentiary standards is unconstitutional. A state may not arbitrarily prevent a defendant from presenting evidence that is material, trustworthy, and important to his defense. In allowing the prosecution, but not the defense, to use Rule 803(24) to admit hearsay evidence of similar import and character, the trial court violated the constitutional prohibition against arbitrary application of evidentiary standards to defendants.

### 1. The Basis for the Trial Court Ruling

The Idaho Court of Appeals on direct review, *Gray*, 129 Idaho at 795, 932 P.2d at 918, and the district court on habeas review affirmed the facially asymmetrical rulings on similar evidence on an abuse of discretion standard, ruling that the trial court was entitled to conclude that the evidence offered by the prosecution bore particularized indicia of trustworthiness while that offered by the defense did not. A close look at the record, however, indicates that the trial court's decision was not based on any concern about the trustwor-

thiness of the statements. Instead, the trial court acted on a thrice-repeated substantive analysis that could have been used to exclude to Betty Gray statements but was not.

The reasons the trial court actually gave for rejecting the hearsay evidence offered by Gray were that (1) the evidence was not material to the case and (2) because the evidence did not qualify for admission under Idaho's state of mind hearsay exception, Rule 803(3), it also did not qualify for admission under its catch-all hearsay exception, Rule 803(24). These reasons formed the basis of the trial court's holdings on each of the three occasions that the trial court considered the admissibility of the Roundy hearsay evidence offered by the defense. Not once did the court pass judgement on whether the Roundy statements bore particularized guarantees of trustworthiness or indicate that they did not.[6]

In its initial, written disposition, the trial court first analyzed the admissibility of the Roundy hearsay evidence under Idaho's state-of-mind hearsay exception, Rule 803(3).[7] To conduct this analysis, the trial court divided the hearsay into two categories: the parts of Roundy's statements regarding (1) her state of mind; and (2) the factual reasons for her state of mind. The latter included Roundy's statements that "(1) she had heard that Dyer was a mercenary; (2) Dyer had threatened to kill her; (3) Dyer had followed her around; and (4) Dyer kept calling her and always seemed to know her address." The court declared the statements regarding Roundy's state of mind immaterial and thus inadmissible. It then held that the statements indicating the reasons for Roundy's state of mind were statements of fact and thus did not qualify for admission under the state of mind hearsay exception.

The next section of the trial court's written disposition analyzed the hearsay evidence under Idaho's residual hearsay exception, Rule 803(24).[8] Here, the trial court held, once again, that because the statements relating to Roundy's state of mind were not material, they were inadmissible. As to the parts of the statements that indicated the factual reasons for Roundy's state of mind, the trial court stated, in passing, that because they failed to qualify for admission under Idaho's state of mind hearsay exception, they also

6. Indeed, as we discuss later, it is clear from the record that Gray adequately met the trial court's only request for an offer of proof concerning the situational context of the Roundy statements.

7. When the declarant is unavailable, Rule 803(3) allows for the admission of:
A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

8. When the declarant is unavailable, Rule 803(24) allows for the admission of:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

did not qualify for admission under Idaho's residual hearsay exception.[9]

Two days later, the trial court reaffirmed its ruling in a brief oral statement. In denying the defense's renewed request that the trial court admit the hearsay evidence, the trial judge reaffirmed the reasoning in its written order.[10] Just as in its earlier written order, the trial court did not focus on the facts of which Roundy spoke or the circumstances in which the remarks were uttered, and therefore did not indicate in any way that it believed the hearsay statements regarding these facts lacked particularized guarantees of trustworthiness.

Two weeks later, the trial court again considered the admissibility of the hearsay evidence under Rule 803(24). Again, the trial court issued its ruling orally.[11] And,

9. The following is the trial court's written analysis regarding the admissibility of Roundy's statements under Rule 803(24) (emphasis added):

Gray also offers the foregoing statements under the "catch-all" exception to the hearsay rule under Rule 803(24), I.R.E. In order for a statement to be admissible under Rule 803(24), I.R.E., the court must find, among other things, that "the statement is offered as evidence of a material fact." The majority of courts have held that a victim's stated fear of a person is only evidence of a material fact under the circumstances enumerated above: i.e., (1) where a defendant raises a claim of self-defense, suicide or accidental death and the declarant-victim feared such defendant; and (2) where the declarant-victim's fear of a defendant is offered to rebut a claim by the defendant that the defendant's relationship with the victim was good. However, at least one court has held that a victim's stated fear of a person is probative evidence of the identity of the killer and, therefore, evidence of a material fact. See State v. Gause, 107 Ariz. 491, 489 P.2d 830, 833 (1971).

Because this court is of the opinion that evidence of one person's state of mind is only minimally probative of the state of mind of another, and because the view adopted in Gause, supra, would, in effect, allow evidence of one person's state of mind to be introduced as evidence of the state of mind of another (i.e. it would permit a victim's fear of a particular person to be introduced as probative evidence of such person's murderous intent), this court is inclined to follow the majority view. Therefore, having concluded herein that Roundy's statements that she feared Dyer and her reasons for such fear do not fall within either of the circumstances which would allow the statements to be admitted as evidence under Rule 803(3), I.R.E., it follows that such statements are also inadmissible under Rule 803(24), I.R.E.

10. The following is the court's first oral analysis regarding the admissibility of Roundy's statements:

[F]or the reasons that I stated in my written opinion, I don't think that the statements that were presented to me for review fall within any exception to the hearsay rule.

And, therefore, I'm going to stand by written decision. So I will allow that limited interrogation as to Mr. Rodriguez concerning this particular suspect, but I'm not going to allow you to get into hearsay statements that we addressed in the prior hearing.

11. The following is the court's second oral analysis regarding the admissibility of Roundy's statements under Rule 803(24) (emphasis added):

All right. I have ruled on this at least twice before. I issued a written opinion at an earlier date, and at that time I pointed out that the majority of courts have held that a victim's stated fear of a person is only evidence of a material fact under the circumstances enumerated in Rule 803, sub part 24; that is, where a defendant raises a claim of self defense, suicide, or accidental death, and the declarant victim feared such defendant, and where the declarant victim's fear of a defendant is offered to rebut a claim by the defendant that the defendant's relationship with the victim was good.

. . . .

Therefore, it seems to me that Reeda Roundy's statements that she feared Mr. Dier [sic] and her reasons for such fear

again, the trial court mentioned the "reasons" for Roundy's fears—that is, the facts concerning her former lover's behavior—only in general and only in passing. Never did the trial court indicate that the requisite guarantees of trustworthiness were lacking. Instead, it is apparent that, given the trial court's rulings, any offer by Gray to put on a witness to show trustworthiness would have been refused, on the ground—thrice repeated—that the evidence was simply immaterial, however trustworthy.

### 2. Applicable Constitutional Principles

#### a. Constitutional Protections

▇ Under 28 U.S.C. § 2254(d)(1), a federal court may grant an application for a writ of habeas corpus for a claim adjudicated in a state court if—and only if—that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Supreme Court has held that the clauses "contrary to" and "unreasonable application of" have independent meaning. *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001); *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see Packer v. Hill,* 277 F.3d 1092, 1101 (9th Cir.2002). The "contrary to" clause applies, *inter alia,* when a state "applies a rule that contradicts the governing law set forth" in the Supreme Court's cases; the "unreasonable application of" clause applies when a state identifies the correct legal standard but applies it unreasonably.

*Penry,* 121 S.Ct. at 1918 (quoting *Williams,* 529 U.S. at 404, 120 S.Ct. 1495). Because the Idaho state courts did not apply the pertinent constitutional rules established by the Supreme Court, discussed below, they applied an incorrect legal standard. Thus, the "contrary to" clause governs in this case, and the only questions remaining are (1) whether there was constitutional error; and (2) "whether the error had a substantial or injurious effect on the verdict." *Packer,* 277 F.3d at 1102 (citing *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

▇ Two principles of constitutional law, both clearly established by Supreme Court precedent, figure prominently in determining whether there was constitutional error in this case. First, a state rule or ruling may not arbitrarily deprive a defendant of his right to present a defense or his right to present witnesses on his behalf. Second, a state rule or state judge may not without justification impose stricter evidentiary standards on a defendant desiring to present a witness' testimony than it does on the prosecution.

▇ These rules emanate from the general principles that in our system of justice, a defendant has the fundamental rights to present a defense and to present witnesses. For more than fifty years, the Supreme Court has clearly and repeatedly articulated these core constitutional guarantees.

In 1948, Justice Black, writing for the Supreme Court, declared that a defendant's "right to his day in court" is "basic in our system of jurisprudence" and in-

---

don't fall within either of the circumstances which would allow the statements to be admitted as evidence under Rule 803, sub part 3, and it would also follow that such statements would not be admissible under Rule 803, sub part 24.

So I will affirm my prior ruling on that issue and sustain the state's objection to that evidence.

cludes "as a minimum, a right to examine the witnesses against him, *to offer testimony,* and to be represented by counsel." *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (emphasis added). Since then, the Supreme Court has again and again noted the "fundamental" or "essential" character of a defendant's right both to present a defense, *Crane v. Kentucky,* 476 U.S. 683, 687, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); *Webb v. Texas,* 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972); *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), and to present witnesses as a part of that defense. *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Rock v. Arkansas,* 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 294, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Webb,* 409 U.S. at 98, 93 S.Ct. 351; *Washington,* 388 U.S. at 19, 87 S.Ct. 1920. The Court has variously stated that an accused's right to a defense and right to present witnesses emanate from the Sixth Amendment, *Taylor,* 484 U.S. at 409, 108 S.Ct. 646; *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Due Process Clause of the Fourteenth Amendment, *Rock,* 483 U.S. at 51, 107 S.Ct. 2704; *Trombetta,* 467 U.S. at 485, 104 S.Ct. 2528; *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038; *Webb,* 409 U.S. at 97, 93 S.Ct. 351; *Oliver,* 68 S.Ct. at 507, or both. *Crane,* 476 U.S. at 690, 106 S.Ct. 2142; *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Washington,* 388 U.S. at 17–18, 87 S.Ct. 1920.

The Sixth Amendment source of these rights is the Compulsory Process Clause, which embraces "the right to have the witness' testimony heard by the trier of fact." *Taylor,* 484 U.S. at 409, 108 S.Ct. 646. *Washington* formally incorporated the Compulsory Process Clause into the Due Process Clause of the Fourteenth Amendment. 388 U.S. at 17–19, 87 S.Ct. 1920. That case stated:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19, 87 S.Ct. 1920.

A state court may violate a defendant's right to present a defense and witnesses by applying evidentiary standards in an arbitrary or uneven way. In *Washington,* for example, the Supreme Court held that a Texas rule that prevented an accomplice from testifying on a defendant's behalf arbitrarily denied the defendant his right to offer the testimony of a witness. 388 U.S. at 23, 87 S.Ct. 1920. Similarly, in *Rock,* the Supreme Court held that Arkansas' per se rule excluding all hypnotically refreshed testimony was an arbitrary infringement of the defendant's right to present testimony. The Court stated that a state's restrictions on testimony may not be arbitrary, 483 U.S. at 55–56, 107 S.Ct. 2704; that a state "may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand;" and that a state "may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." *Id.* at 55, 107 S.Ct. 2704.

In addition to ruling that a state may not arbitrarily apply evidentiary standards, the Supreme Court has also focused its criticism on a particular variety of arbitrariness: the unjustified and uneven application of evidentiary standards in a way that favors the prosecution over defendants. In *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam), the Supreme Court reversed a death penalty sentence because the trial court had excluded testimony offered by the defense under Georgia's hearsay rules. While Georgia's hearsay rules did not allow the admission of evidence that would have been exculpatory in Green's sentencing hearing, the state's rules did allow the government to introduce the same evidence in his co-defendant's trial. The Supreme Court held the exclusion of the evidence at sentencing to be reversible error, listing several reasons why the trial court should have admitted the hearsay testimony. The Court concluded: "Perhaps most important the State considered the testimony sufficiently reliable to use it against [Green's co-defendant], and to base a sentence of death upon it." *Id.*

■ Other cases confirm and apply the principle that a state rule or ruling that imposes a greater evidentiary burden on a defendant without justification violates due process. In *Webb,* for example, the trial judge admonished the defendant's witness at length to testify truthfully, but did not give similar warnings to the state's witnesses. As a result of the trial judge's lecture, the defendant's witness refused to testify. The Supreme Court ruled that the "trial judge gratuitously singled out this one witness," and held that the witness' subsequent refusal to testify deprived the defendant of due process. 409 U.S. at 97–98, 93 S.Ct. 351.

Similarly, in *Washington,* the Supreme Court objected to a Texas rule that applied unequal standards to defendants and the state. Under the Texas rule, an accomplice could testify for the state but not for the defendant. The Court ruled that this distinction was not rational. 388 U.S. at 22, 87 S.Ct. 1920. Justice Harlan, in concurrence, emphasized the arbitrariness and unevenness of this distinction. He stated that the different rules applicable to the state and the defendants violated the Due Process Clause, because a state may not recognize as relevant and competent the testimony of a certain category of witness but arbitrarily bar use of testimony by that same kind of witness by the defendant. *Id.* at 24–25, 87 S.Ct. 1920; *see also Chambers,* 410 U.S. at 295–98, 93 S.Ct. 1038 (unconstitutional to bar defendant from impeaching his own witness although the government was free to impeach that witness); *Cool v. United States,* 409 U.S. 100, 103 n. 4, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972) (jury instruction telling the jury that it could convict solely on the basis of accomplice testimony but not that it could acquit on this basis constituted grounds for reversal).

■ Here, the trial court indubitably applied Idaho's residual hearsay exception arbitrarily and unevenly. With no explanation at all, the trial court used two completely different analytical frameworks when considering the prosecution and defense's hearsay evidence under Rule 803(24). The trial court's analysis diverged in at least three significant ways, explained below, depending on whether the evidence was offered by the prosecution or the defense. Not surprisingly, the different Rule 803(24) analysis used by the trial court resulted in diametrically opposite rulings: While the trial court rejected the defense's hearsay evidence, it admitted substantially parallel hearsay evidence submitted by the prosecution.

The *first,* and most important, difference between the trial court's Rule 803(24) analytical frameworks was that the trial court considered whether hearsay statements *of fact* offered by the prosecution were material to the case, but did not consider materiality when the defense offered hearsay statements of fact. In three different instances, the trial court admitted a hearsay statement *of fact* offered by the prosecution after devoting a paragraph of its analysis to consideration of whether the statement was material to the case. In these instances, the trial court noted that two of the comments "tend to prove that Gray was the killer," and a third comment "established a motive for the killing." Based on these careful analyses, the trial court held all three statements material to an issue in the case, and therefore admissible under Rule 803(24).

In contrast, when the trial court declared inadmissible the hearsay statements of fact offered by the defense, the trial court did not once consider whether the statements were material to the case-even though the trial court explicitly acknowledged that some of the hearsay statements offered by the defense were statements of fact.[12] Instead of considering whether the hearsay statements of fact were material when determining their admissibility under Rule 803(24), the trial court conducted a detailed examination as to why the hearsay statements *relating to Roundy's state of mind* were not material. This failure to consider the materiality of the defense's hearsay statements of external fact, lumping them in instead with the state of mind facts, was critical: As a result of that merging of diverse statements, the external fact statements were rejected summarily for lack of materiality, with no pertinent analysis or explanation.

The *second* way in which the trial court's Rule 803(24) analysis differed depending on the party was that the trial court gave preclusive effect to its findings under Rule 803(3) when it considered the defense's evidence but not when it considered the prosecution's. Although the trial court used a different analytical framework when considering the two parties' hearsay evidence under Rule 803(24), at least one aspect of the analysis was consistent: In each case, the Rule 803(24) analysis immediately followed consideration of the same evidence under Rule 803(3). When the trial court moved onto the Rule 803(24) analysis on behalf of the prosecution, it began its consideration of the hearsay evidence anew, but, inexplicably, did not accord this advantage to the defense.

For example, the trial court admitted under Rule 803(3) a statement offered by the prosecution indicating the reasons Betty Gray feared that Gray had discovered her affair with Leavitt. In its decision, the court noted that the statement was one of fact, making it inappropriate for admission under the state of mind hearsay exception. Then, the trial court moved on to consider the same statement under the 803(24) hearsay exception, ruling that the "statement may be offered under Rule 803(24), I.R.E. to prove the facts asserted therein."

Just as the trial court would not admit the prosecution's evidence described above under the state of mind hearsay exception because it was a statement of fact, the trial court also did not admit the defense's hearsay statement of fact evidence under the state of mind hearsay exception. This time, though, when the court moved on to

---

**12.** Immediately prior to considering the defense's proffer under Rule 803(24), the district court wrote (emphasis added): "Because *Roundy's stated reasons for her fear of Dyer are* *statements of fact,* such statements are also not admissible under the 'state of mind' exception in Rule 803(3), I.R.E."

consider the admissibility of the evidence under the residual hearsay exception, it viewed its prior analysis under Rule 803(3) as dispositive.

The *third* way that the trial court's analytical structure under Rule 803(24) differed depending on the identity of the party was that the trial court included a pro-admissibility factor in its analysis only when considering the admissibility of the evidence submitted by the prosecution. In admitting the prosecution's hearsay testimony, the trial court consistently gave weight to the factor that "the interests of justice are best served when the jury is presented with as much information as possible about the case." Despite this factor's *constitutional* significance with regard to statements offered by the *defense*, *see Washington*, 388 U.S. at 19, 87 S.Ct. 1920 (right to offer testimony is "in plain terms ... the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies"), and although defense counsel argued that the jury should be allowed to see the whole picture, the trial court did not consider it when determining the admissibility of the hearsay statements offered by Gray. The trial court gave no explanation for why the prosecution was accorded the benefit of this pro-admissibility factor but the defense was not. Nor can we think of any explanation for such treatment.

Judge Trott, in dissent, suggests that the Roundy factual statements excluded were not analytically parallel in their content to some of the Betty Gray statements that the court admitted, but he never explains why not. We cannot perceive any pertinent difference. Why, for example, do Betty Gray's statements that Gray was angry with Betty Gray "tend to prove that Gray was the killer," while Roundy's statements that Dyer threatened her life do not

tend to prove that Dyer was the killer? We conclude that the trial court, careful though it was as to other matters, in this instance applied entirely divergent analyses and came to irreconcilable results regarding the substantive admissibility of the out-of-court statements by the two victims.

### b. The Limits of the Constitutional Protections

 The above analysis demonstrates that the trial court arbitrarily denied Gray his right to present a defense and witnesses. But so to conclude does not settle the constitutional issue before us. The right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal process." *Chambers*, 410 U.S. at 295, 93 S.Ct. 1038; *see also Rock*, 483 U.S. at 55, 107 S.Ct. 2704. A state's restriction on a defendant's right to present evidence may not rise to constitutional error if the evidence is immaterial, unimportant, or untrustworthy.

### (i) Materiality and Importance to the Defense

 To establish a violation of the constitutional right to present a witness, a defendant must make a "plausible showing of how [the] testimony would have been both material and favorable to his defense." *Valenzuela–Bernal*, 458 U.S. at 867, 102 S.Ct. 3440; *see also Rock*, 483 U.S. at 51, 107 S.Ct. 2704; *United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). In addition, judges may exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion. *Crane*, 476 U.S. at 689–90, 106 S.Ct. 2142.

Much, although not all, of the hearsay evidence Gray submitted regarding Dyer

was material to the case. While the statements regarding Roundy's state of mind were quite probably not material (and we do not ascribe constitutional error to their exclusion), the statements regarding Dyer's occupation, threats, and behavior were. This latter evidence provides some basis for believing that Dyer might have killed Roundy. These facts were also vital to Gray's defense, which rested on the premise that someone other than Gray committed the murders. Gray's attorney emphasized this latter point to the trial judge, stating fervently and often that the testimony is "fundamental to our defense" and that "the key to our defense is to discuss the other suspect." At one point, he pleaded, "I just don't know how we can keep from the jury a possible suspect .... It's like not telling them the entire story."

■ The dissent's suggestions to the contrary notwithstanding, this court has repeatedly recognized that "[e]vidence that someone other than the defendant may have committed the crime is *critical* exculpatory evidence that the defendant is entitled to adduce." *Thomas v. Hubbard,* 273 F.3d 1164, 1177 (9th Cir.2001) (emphasis added). This is true "[e]ven if the defense theory is purely speculative," as "it is the role of the jury to consider the evidence and determine ... whether it presents legitimate alternative theories for how the crime occurred." *United States v. Vallejo,* 237 F.3d 1008, 1023 (9th Cir.2001). We conclude that the factual statements excluded were surely material to the defense.

### (ii) Trustworthiness

■ A state sometimes may show that it did not violate a defendant's constitutional rights by affirmatively demonstrating that it excluded the exculpatory evidence because it was unreliable, in accordance with consistently applied standards. For example, the Supreme Court has explained that in *Chambers* it had demanded the admission of exculpatory evidence because the state "did not demonstrate that the hearsay testimony in that case, which bore assurances of trustworthiness including corroboration by other evidence, would be unreliable." *Rock,* 483 U.S. at 55, 107 S.Ct. 2704 (internal quotations omitted).

Here, Gray's counsel maintained that the testimony was trustworthy, stressing to the trial judge that Roundy's statements had the same situational attributes as the Betty Gray statements admitted as trustworthy—a fearful state of mind, no other way to introduce the statements, adequate detail, and repetition of similar statements to several people. There was no suggestion that Roundy had any motive to fabricate the statements at the time they were made, nor does any such motive suggest itself. The prosecutor did not contend at any point that the defense failed to provide a situational background for demonstrating the trustworthiness of the Roundy statements.

In the face of the arguments that were presented to it, the trial court was very specific about the nature of the proof it needed to determine admissibility—"in fairness, I need to have a name identified to each statement, time, place, and so on ... so I can look at each statement and make a decision ... If you'll summarize that for me in a written or oral offer of proof, then I'll take a look at each statement and analyze it as best I can and make a ruling." Gray met this request, submitting written reports on each of the witnesses he wanted to present. The trial court indicated in its written decision that the submissions were satisfactory, and did not ask to assess live witnesses before making its decision. Instead, the trial court, who was closest to the situation, expressed no concern whatever regarding

the trustworthiness of Roundy's statements, and reached the merits of the question whether the contents of the statements were evidence of a material fact. By doing so, the trial court was, it appears, assuming that the statements otherwise met the requisites for admissibility under the catchall hearsay exception.

Moreover, the prosecution *conceded* that Roundy made these statements to which the witnesses were prepared to testify, stating: "I want to make it clear, I'm not suggesting [the witnesses] are making this up.... I've talked to these people. And yeah, these statements were made." So, the dissent's reliance on the failure to present *live* testimony as justification for the exclusion of the testimony notwithstanding, there would have been no point in calling the witnesses to testify live before the trial judge. Live testimony is essential for making credibility determinations regarding whether the *witness* is telling the truth. Here, there was no dispute about that.

The Court of Appeals of Idaho nonetheless concluded that, because Gray did not provide an adequate offer of proof to demonstrate the requisite guarantees of trustworthiness, "[t]he record does not support the assertion that the district court abused its discretion in excluding such evidence." 129 Idaho at 795, 932 P.2d at 918. In so ruling, the Idaho appellate court, far from rescuing the arbitrary ruling from constitutional invalidity, only exacerbated the due process violation of Gray's right to present a defense: The state Court of Appeals deferred to a decision about trustworthiness that the trial court decidedly did not make and that would have been inconsistent with the trustworthiness standards the trial court applied to Betty Gray's statements.

The trial court's framework for judging the reliability of the prosecution's hearsay testimony consisted of three factors: (1) lack of motive to fabricate; (2) spontaneity and consistent repetition; and (3) mental state of declarant. In admitting the prosecution's hearsay statements, however, the trial court did not strictly adhere to this framework. Although the trial court subjected most of the hearsay submitted by the state to this test, in one case it admitted hearsay evidence submitted by the prosecution without evaluating its trustworthiness at all. In other cases, when admitting evidence under Rule 803(24), the trial court did not consistently require repetition; it did not consistently refer to the mental state of the declarant Betty Gray; and, in referring to the motive to fabricate factor, it sometimes referred to just the declarant's motive, and sometimes referred to both the declarant and the witness' motives. Further, the state's analysis of whether the declarant possessed a motive to fabricate consisted simply of the conclusory statement that it appeared that Betty Gray had no motive to fabricate the statements.

The hearsay testimony offered by Gray fared well according to the standards of trustworthiness actually used by the trial court. Roundy appeared to have no more motive to fabricate her statements than did Betty Gray, and Roundy, like Betty Gray, repeated the statements to several different people. Like Betty Gray's, Roundy's factual statements were coupled with expressions of fear, so it appears that Roundy, like Betty Gray, was frightened when she made these statements of fact.

In short, it is simply not true that there was inadequate contextual basis to apply a trustworthiness analysis to Roundy's statement with the same degree of scrutiny and consistency as was applied to Betty Gray's. Rather, the lack-of-trustworthiness basis for exclusion relied upon by the state appellate court, and by the dis-

sent, is an after-the-fact explanation of a decision that could not be justified on the basis on which it was made. The explanation does not comport with either the record or the trustworthiness standards that the trial court actually applied. As such, the Court of Appeal's decision approving the exclusion of Roundy's statements is simply another example of the application of arbitrary, asymmetrical, and therefore unconstitutional evidentiary rulings in this case.

We conclude that the state courts committed constitutional error when they arbitrarily refused to admit Roundy's statements implicating Dyer.

**3. Substantial and Injurious Effect and Influence**

■ The last issue that we must resolve is whether the trial court's error was harmless under the standard articulated in *Brecht* and *O'Neal v. McAninch,* 513 U.S. 432, 436, 437, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).[13] The *Brecht/O'Neal* standard requires that we first ask whether the trial error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 623, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Fisher v. Roe,* 263 F.3d 906, 917 (9th Cir.2001). If we are in "grave doubt" as to the answer to this question—that is, if we do not have a "fair assurance, after pondering all that happened without stripping the erroneous ac-

tion from the whole" that the error was not harmless—we must grant the habeas petition. *O'Neal,* 513 U.S. at 437, 115 S.Ct. 992 (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239); *Fisher,* 263 F.3d at 917–18.

■ Our precedent provides some further guidance in applying the imprecise "grave doubt" standard: A 55% likelihood that the error was harmless is "hardly a 'fair assurance' of harmlessness . . . and a 45% chance that the defendant would have been acquitted but for the error certainly seems like a 'grave doubt.'" *United States v. Hitt,* 981 F.2d 422, 425 n. 2 (9th Cir.1992) (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239). In other words, to find the trial error harmless, we must conclude that there was considerably more than a 55% likelihood that the error did not affect the jury's verdict.

■ Applying these standards, we have no difficulty concluding that the trial court's decision to disallow the evidence regarding Dyer was not harmless. The affirmative evidence against Gray was entirely circumstantial and far from overwhelming, while the evidence against Dyer would have provided the jury with a possible answer to the critical question that arises whenever the defendant's defense is that he did not commit the crime: Then who did?

As to the first point, the nature and strength of the case against Gray: The trial judge's comments, made on three dif-

---

**13.** The warden does not address the *Brecht* question anywhere in his brief, focusing exclusively on the argument that no constitutional error occurred. This circuit has not decided whether the government's failure to address harmlessness in a habeas case constitutes a waiver of that issue, although there is case law from the Seventh Circuit so indicating. *See Holland v. McGinnis,* 963 F.2d 1044, 1057–58 (7th Cir.1992); *Wilson v. O'Leary,* 895 F.2d 378, 384 (7th Cir.1990) (Easterbrook, J.) ("Procedural rules apply to the government as well as to defendants."). As we are convinced that the government in this case could not meet the *Brecht* standard had it been addressed, we leave to another day the question whether to enforce a waiver rule on habeas if the government does not argue that an asserted constitutional error was harmless.

ferent occasions, are the best guide in evaluating the strength of the state's case. The trial judge first addressed the question on defendant's initial motion for acquittal:

> Frankly, I've been very troubled throughout the case as to the strength of the state's case. It's obvious that someone committed these terrible crimes, but the state's evidence linking the crimes with the defendant has been minimal.
>
> The question I have to decide is whether or not any reasonable jury could find beyond a reasonable doubt that the defendant committed this crime. Admittedly, the evidence is equivocal on that issue.

The judge nonetheless decided to "reserve ruling on that motion and see what the jury decides." When the jury returned a guilty verdict and the motion for acquittal was renewed, the trial judge again summarized his views concerning the strength of the state's case:

> I must admit that throughout the trial, I kept waiting for the State to present conclusive evidence, such as fingerprints, eyewitnesses, that would tie the Defendant to the crime scene ... and frankly, it did not come in. The evidence was, for the most part, if not entirely, circumstantial evidence. .... *[T]he question was and is: Was there sufficient evidence submitted so that the jury could find that this Defendant was the individual who did commit the crimes* ...
>
> I have given this case a good deal of thought, and it has been a troubling case to me.... *Had this Court been on the jury, I would perhaps have evaluated the evidence differently than other members of the jury. I may have determined the credibility of witnesses differ-*

*ently than the jury did and afforded different weight to the evidence than did the jury in this case and may have drawn different inferences from the evidence* ...

(emphasis added). Despite his doubts, the trial judge determined that there was sufficient evidence to support the jury's verdict, while opining that "I hope and trust the matter will be appealed so we can have another view as to whether there was sufficient evidence."

Later, in deciding not to impose the death penalty, the trial judge specifically summarized the evidence that led him to have a "lingering or residual doubt as to the defendant's guilt of the crimes for which he has been convicted." Those facts, the judge stated, were:

(1) The defendant has steadfastly maintained his innocence.

(2) The state was unable to produce a murder weapon.

(3) The state was unable to identify any finger prints of the defendant to link him to the crimes.

(4) The state was unable to produce convincing evidence that the footprints found at the scene of the crime were those of the defendant.

(5) The state was unable to conclusively establish that the hairs found at the scene of the crimes were from the defendant.

(6) Although a witness testified that he saw the defendant in a green International Travelall vehicle at a hospital parking lot approximately 3.5 miles from the crime scene in the early morning of the day of the crimes, the witness also testified that the man he saw had no facial hair when, in fact, at that time the defendant had a full beard.[14]

---

**14.** To these observations could be added: evidence tending to show that the defendant did

Given the paucity in the physical and eyewitness testimony, one can infer that the evidence concerning Gray's anger toward his wife and motive for murdering her—that she was seeking a divorce—was of great importance in the jury's deliberations. Indeed, the substance of the prosecutor's closing argument *began* by focusing on the question of who had the motive and temperament to murder the two women, endeavoring to show that Gray did and the two other possible suspects aside from Dyer did not.[15]

On the other side of the ledger in deciding whether the *Brecht/O'Neal* standard has been met is the nature of the evidence excluded. As this court has oft recognized, where the evidence against the defendant is purely circumstantial and the pivotal issue is therefore identity, "jurors would naturally ask themselves, 'If the defendant didn't [commit the crime], who did?'" *United States v. Crosby*, 75 F.3d

1343, 1347(9th Cir.1996) In that context, evidence "support[ing] an alternative theory of how the crime might have been committed" is likely to be "crucial to the defense."[16] *Id.*

Nor is the likely importance of an alternative suspect diminished because Dyer was not the only such suspect. In considering "the impact of the thing done wrong on the minds of other men, not one's own, in the total setting," *Kotteakos*, 328 U.S. at 764, 66 S.Ct. 1239, we are asked to make a judgment about the likely reasoning patterns of others. Looking closely at the record before the jury in order to make that judgment, we note that while there was evidence that the two other possible suspects, Leavitt and Riley, had a motive to murder, there was no evidence that either had expressly threatened to do so and had taken actions consistent with doing so (stalking, keeping up with Roundy's whereabouts).

*not* commit the crime, including his doctor's testimony that he was not physically capable of riding his bicycle as alleged; Mackley's testimony concerning the precise make and color of the vehicle he had seen was not ironclad; and the consideration that there were credibility issues regarding some of the victim's and defendant's relatives who testified against the defendant.

15. Dyer was not presented to the jury as a possible suspect. Unable to present the Roundy statements concerning him, the defense elected not to elicit from the investigators the fact that Dyer was also a suspect. As Gray's counsel explained in the passage quoted in the dissent (post, at 660–61), without the Roundy statements indicating that Dyer had stalked and threatened to kill one of the victims and had the means to do so, bringing up the fact that he had been investigated as a suspect would have been of no help to the defense.

The dissent is therefore incorrect in suggesting the defense conceded the uselessness of the Dyer evidence. To the contrary, only after trying unsuccessfully three times

to introduce the Roundy statements and representing, repeatedly, its great importance did the defense abandon its plan to cast suspicion on Dyer, reasoning that to do so with no evidentiary support would be counterproductive.

16. It is noteworthy that repeatedly, when we have considered the likely impact of a constitutional error, we have taken particular note of the strength of the prosecution's case, recognizing that where that case is not strong, evidentiary and other matters that might otherwise be of little consequence take on potentially dispositive significance. *See, e.g., Sassounian v. Roe*, 230 F.3d 1097, 1111 (9th Cir.2000) ("It cannot be said that the other evidence amassed at trial was so overwhelming that the jury would have reached the same result even if had not considered the [material not properly before it]."); *Eslaminia v. White*, 136 F.3d 1234, 1239 (9th Cir.1998) (error was not harmless in part because the "prosecution case was far from overwhelming"); *Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir.1996) (Wright, J., concurring) (error was not harmless because the prosecution's evidence was not overwhelming).

Further, and critically, whether it seems to us, or to trial counsel, or to the dissent, that Dyer was a better or worse alternative suspect than the other two is not the question. Rather, we have been admonished that "one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason." *Id.* at 764, 66 S.Ct. 1239. Viewing the record in that light, we conclude that, given the overall weakness of the state's case, had the Dyer evidence been before them, one or more jurors "not . . . generally acting without reason" could have been swayed. A juror might reasonably decide that the Dyer evidence lessened the significance of one of the stronger parts of the case against Gray, his anger at his wife and motive to murder her; having so determined such a juror could thereby be pushed over into harboring a reasonable doubt of Gray's guilt. At least, we harbor a "grave doubt" that no juror "not . . . generally acting without reason" could have so reacted. To our conviction that applying the *Brecht/O'Neal* standard we must grant the habeas petition, the dissent's principal objection—there are others, but we believe we have answered them in the course of explaining our own reasoning—is that Dyer had an alibi, so the jury would *not* have been swayed by the evidence of his threatening behavior. Dyer never testified, whether before the jury or in an offer of proof, and except for an attorney's statement that he claimed to have been in a small town in Oregon at the time of the murders, no details of the alibi appear in the record. We do not know precisely where he said he was, what he said he was doing, who he was with, whether there is corroboration of the alibi, or whether there is any evidence that his alibi is not true. All we do know is that he provided some sort of evidence that he was out of Idaho at the time of the murders,

that the prosecution believed it, and that the defense was aware that if the Roundy statements about Dyer were introduced, it was likely that there would be alibi evidence as well.

From this amorphous state of affairs, the dissent concludes that Dyer had a "valid and unchallenged alibi," *post* at 662, and that the trial court's exclusion of the Roundy statements concerning Dyer was therefore harmless. The truth is that we have no idea—and more importantly, the jury, on the present record, had no idea— whether or not Dyer's alibi would have been "unchallenged" or whether it was "valid." For all we know, Dyer might have presented his alibi only to be decisively impeached, Perry Mason-style, on cross examination. That possibility is not particularly far-fetched: Dyer not only denied being in Oregon but also "denied knowing much about Reeda Roundy, not seeing her in a long time, certainly not harassing her, threatening her, following her, or anything of that sort." Had four witnesses testified to Roundy's statements to the contrary, it is possible that the jury would not have regarded Dyer as a truthful person whose representations regarding his whereabouts on the night of the murder were to be believed.

This last scenario is, of course, an exercise in speculation. But so to recognize is only to highlight that embarking upon speculation concerning how the trial would have unwound had the evidence excluded been admitted is inconsistent with our role in determining whether there was *Brecht/O'Neal* error (or any other version of harmless error rule, for that matter).

*Brecht* and its forebear, *Kotteakos,* make clear that a trial error is considered harmless only if the *actual* jury in the case would have reached the same verdict absent the error. "The test under *Kotteakos* is whether the error 'had substantial and

injurious effect or influence *in determining the jury's verdict.*'" *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (emphasis added) (quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. 1239); *see also id.* at 629, 113 S.Ct. 1710(trial error "is amenable to harmless-error analysis because it 'may ... be quantitatively assessed *in the context of other evidence presented* in order to determine [the effect it had on the trial].'") (alterations in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)); *Kotteakos*, 328 U.S. at 764, 66 S.Ct. 1239 (judicial analysis of impact of error must take place "in relation to all else *that happened*") (emphasis added). The emphasis, in other words, must be on what *actually occurred* in the courtroom before the jury.

To go beyond the record before the court in deciding the likely impact of excluded evidence on the jury would, indeed, implicate the defendant's Sixth Amendment right to a trial by jury in the guise of determining harmlessness. As Justice Scalia explained in *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993):

> Consistent with the jury-trial guarantee, the question ... is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the jury *actually rested* its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.

(alterations in original) (internal quotations and citations omitted).

Our precedent likewise dictates that we must not construct a hypothetical trial, but instead consider the effect of the trial error on the actual jury's actual verdict. In *Hanna*, 87 F.3d at 1039, we stated that: "the proper harmless error inquiry in habeas proceedings is for the judge to ask, *based on the record's facts*, whether he or she believes 'that the error substantially influenced the jury's decision?'" (emphasis added). We are not aware of any case to the contrary—that is, a case in which excluded evidence was adjudged to have been harmless because of possible additional evidence that was *not* before the jury (or for that matter, before the judge, except in broad outline), and the dissent does not cite any.

In sum, the dissent's reliance upon an alibi that might have been admitted but was not, and as to which we know almost nothing, cannot affect the *Brecht/O'Neal* analysis. We therefore are not dissuaded from our conclusion that on the decisive question, we cannot say with any acceptable level of confidence that the evidence excluded, if admitted, could not have had a substantial influence on the jury's deliberations.

## III. Conclusion

Because the trial court applied Idaho's rules of evidence in two very different ways depending on whether the prosecution or the defense presented the evidence, it violated Gray's constitutional rights. This error was not harmless. Therefore, we REVERSE the trial court's grant of summary judgment for the warden and REMAND to the district court with instructions to grant the writ, requiring that the state of Idaho to bring Gray to trial again within a reasonable amount of time or release him from custody.

TROTT, Circuit Judge (Concurring in part, dissenting in part):

In this case, my colleagues order a new trial for a man convicted of murdering his former wife and a friend. In my judgment, their ground for this errant order is nothing more than that he was not allowed to introduce in his defense stale, pointless, and untrustworthy hearsay evidence excluded by the trial court and Idaho's Court of Appeals as inadmissable, irrelevant, and immaterial. Thus, although I agree with much of my colleagues' otherwise excellent opinion, I respectfully dissent on the dispositive issue.

## I

### Hearsay

My colleagues conclude that the trial judge and Idaho's appellate courts were guilty of the asymmetrical application of state law evidentiary standards with respect to "parallel evidence." I respectfully disagree.

### 1.

### Betty Gray's Statements

The trial court's decision *to allow* some of victim Betty Gray's out-of-court statements under Idaho's residual hearsay exception did not violate William Gray's Sixth Amendment right to confront witnesses. *See* U.S. Const. amend. VI; Idaho R. Evid. 803(24). In this respect, I agree with my colleagues. When a declarant is unavailable to testify, the Confrontation Clause countenances hearsay only if it demonstrates adequate indicia of reliability either by (1) falling within a firmly rooted hearsay exception; or (2) bearing particularized guarantees of trustworthiness. *See* e.g., *Idaho v. Wright*, 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts*, 448 U.S. 56, 62–63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Califor-*

*nia v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Idaho's residual hearsay exception, under which the challenged statements were admitted, is not a firmly rooted hearsay exception. *Wright*, 497 U.S. at 817, 110 S.Ct. 3139. However, Betty's statements bore particularized guarantees of trustworthiness. The government presented the live testimony of Joanne Buccola as to the situational background of Betty's statements. Buccola was subjected to intense cross-examination by Gray's counsel. She testified that Betty spontaneously uttered the statements, repeated them several times, and was in an excited state when she made them. As the federal district court correctly observed, the trial court engaged in precisely the type of careful process that the Supreme Court suggested was necessary to protect the Defendant's rights under the Confrontation Clause. *Wright*, 497 U.S. at 814–16, 110 S.Ct. 3139. Moreover, the trial court analyzed the factors which tend to show that a statement bears particularized guarantees of trustworthiness, including spontaneity, consistent repetition, state of mind, and lack of motive to fabricate. *Id.* Furthermore, the Court of Appeals of Idaho reviewed this issue as a matter of the State's rules regarding hearsay, and it concluded that the trial court's decision had a basis in State law and was not an abuse of discretion. *State v. Gray*, 129 Idaho 784, 932 P.2d 907 (Ct.App.1997).

### 2.

### Reeda Roundy's Statements

The trial court's decision *to preclude* Gray from introducing certain out-of-court statements made by Reeda Roundy about an alternative suspect did not violate Gray's constitutional rights, and it was fully consonant with Idaho's evidentiary rules

regarding hearsay. In this respect, I disagree with my colleagues. To begin with, the Court of Appeals of Idaho concluded on direct review after a full analysis of the issue that *under State law*, "Roundy's statements regarding her concern about her ex-boyfriend are inadmissible because they *fail to meet the test for relevancy.*" 932 P.2d at 918 (emphasis added). In the main, a victim's fear of an individual in Idaho is relevant only in certain circumstances, and none of them was present in this case; and "Roundy's *fear* of a third person does not establish or disprove Gray's guilt." *Id.* The Court of Appeals then analyzed Dyer's allegedly threatening behavior under its residual hearsay exception, Rule 803(24) and concluded here also that this evidence was properly excluded. Why? Because it bore "no guarantees of trustworthiness:"

> The district court also considered I.R.E. 803(24) as an alternative theory of admissibility. As discussed earlier, I.R.E. 803(24) *requires that the trustworthiness of the statement must be shown from the totality of the circumstances that surround the making of the statement. Wright*, 497 U.S. at 819, 110 S.Ct. 3139. In seeking the admission of the evidence at trial, Gray's counsel presented to the district court the content of the statements. *Defense counsel did not provide an offer of proof which indicated the circumstances surrounding Roundy's declarations.* The witnesses who allegedly heard Roudy's statements were not called upon to provide a situational background for the statements. Hence, *there is no record of the circumstances surrounding the statements.* We cannot say that Roundy's factual statements regarding her ex-boyfriend's behavior and occupation bore the circumstantial guarantees of trustworthiness which would have justified admission under I.R.E. 803(24). The record does not support

the assertion that the district court abused its discretion in excluding such evidence.

*State v. Gray*, 129 Idaho at 795, 932 P.2d at 918 (emphasis added).

My colleagues' lengthy protestations notwithstanding, we have a loud, clear, and unambiguous statement from Idaho's Court of Appeals that this disputed piece of evidence lacked the guarantees of trustworthiness. This certainly differentiates it from the evidence mistakenly used by Judge Berzon as a comparison.

"It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Therefore, even if I were to agree with Gray that the trial judge erred as a matter of Idaho evidentiary law by not admitting Roundy's statements—which I do not—we would be forbidden from granting Gray's federal habeas petition, unless his resulting "conviction violated the Constitution, laws, or treaties of the United States." *Id.*

Recognizing our habeas limitations, Gray attempts to force a constitutional slipper onto his state evidentiary claim by arguing that the trial court's decision not to allow him to introduce Roundy's irrelevant out-of-court statements violated his due process right to present a defense. This is a strained refrain we hear far too often. Gray claims that the trial court arbitrarily applied the state's residual hearsay exception, Idaho R. Evid. 803(24), because it allowed the state to introduce Betty's statements about why she feared her husband, but precluded Gray from introducing Reeda's statements about why she feared a particular alternative suspect. This application, says Gray, deprived him of the opportunity to put on a defense. *See e.g., Rock v. Arkansas*, 483 U.S. 44, 54,

107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Washington v. Texas,* 388 U.S. 14, 22, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

Although the trial court came to different conclusions regarding the two women's somewhat similar statements, I am satisfied that a substantial distinction between the parties' offers of proof as articulated clearly by the Idaho Court of Appeals demonstrates that the trial court did not act arbitrarily. The majority is mistaken in its claim that the two victims' hearsay statements were "parallel," as Judge Wood's and the Court of Appeals' decisions demonstrate. Thus, no asymmetrical treatment amounting to a constitutional violation occurred.

As part of its offer of proof, the state presented a witness, Joanne Buccola, who testified in person out of the presence of the jury about the situational background of Betty's statements. Buccola described for the trial judge Betty's harried state-of-mind, her consistent repetition of the statements, and the fact that Betty spontaneously uttered the statements, not in response to any leading questions. The trial judge specifically relied on Buccola's demeanor and detailed testimony in concluding that Betty's out-of-court statements bore sufficient particularized guarantees of trustworthiness to be admitted under the residual hearsay exception. I underscore here that the trial judge observed this witness on the stand, listened to her testimony, and made a determination of relevancy and admissibility that is entitled to deference. More about relevance later.

Gray's offer of proof, in contrast, included *no* witness to provide a situational background for Roundy's statements. Indeed, Gray never asked the trial court if he could call such a witness out of the presence of the jury to provide such a background. Instead, Gray's counsel relied wholly on his own oral proffer as to what the witnesses would say to if allowed to testify. At one point, Gray's trial counsel stated for the record that he was requesting "the opportunity to call these witnesses." During oral argument, Gray's appellate counsel forthrightly admitted that trial counsel's request referred to calling these witnesses to testify *in front of the jury,* not to calling them in front of the judge to provide the situational background of the statements. The record supports appellate counsel's characterization of the events.

Simply because the trial court precluded Reeda's statements and admitted Betty's statements does not demonstrate that the trial court violated Gray's constitutional rights, far from it. Gray's opportunity to lay a proper foundation was in the trial court. He did not avail himself of that opportunity, and it is not for the federal courts to remedy his failure. The notable qualitative difference between the government's offer of proof and Gray's offer of proof as well as the manifest legal differences between the two submissions satisfy me that the trial court did not act arbitrarily so as to deprive Gray of his due process right to present a defense. As Judge Wood correctly noted in response to Gray's attempt to use this evidence, the right to defend does *not* include the right to do so with inadmissible evidence. This is the short answer to Gray's meritless claim that he was not allowed to defend himself.

## II

### Substantial and Injurious Effect or Influence

Even were I to start from the flawed proposition that Judge Berzon's constitutional analysis regarding the exclusion of

Reeda Roundy's alleged statements is correct, which respectfully I do not, I conclude nevertheless that Judge Wood's decision to preclude the disputed statements absolutely did not have a "substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Here, I have no doubt whatsoever about this conclusion. When one examines the excluded evidence and asks what impact it would have had on the jury, the answer in my view is at best "not much." Among other problems, one needs to consider here what the *whole* package would have been had the evidence been admitted and then countered as promised by the prosecution. It is not enough to examine the disputed evidence divorced from its context and the rest of the record.

The police had investigated Dyer and concluded that he had a valid alibi. This neutralizing evidence of Dyer's alibi would have been admissible, as recognized in *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), to demonstrate that the investigation conducted by the police was comprehensive and not shoddy. Gray's counsel admitted at trial that if he introduced the allegedly inculpatory evidence, the prosecution would call the officers to testify about Dyer's alibi. E.R. 120, p. 259. Counsel did not attack Dyer's alibi or suggest that it was a fraud. In fact, Gray's counsel referred to Dyer as just a "suspect" and even admitted that Dyer was not the best "alternative suspect." Indeed, he argued that other suspects were more likely than Dyer, and that he just wanted the jurors to have a "complete picture" of the situation. According to counsel, Dyer was just the *third* on the list of "possibles." Suspect # 1 was Betty Gray's current lover, Leavitt, who discovered the bodies and called the police. Suspect # 2 was Roundy's current lover, Hugh Riley.

To demonstrate how flimsy the excluded Dyer evidence was, one need only to look to Gray's own counsel's description of it and the irrelevant purpose for which it was being offered to the trial court:

MR. RADIN: Thank you. Judge, our defense, the key to our defense is to discuss the other suspects. We haven't made this up, Judge. They were suspects—J.W. Dier, LeRoy Leavitt, and Hugh Riley—were all suspects in the minds of the police officers.

They're all investigated. The alibis of all three were checked. So it's important for us, and I hope you understand, if I can express any one thing in this morning's hearing, is that the key to our defense is to at least discuss with the jury the other suspects.

They can draw their own conclusion as to each one. But we have to at least make the whole picture known to them.

THE COURT: But you can't do it through inadmissible evidence.

MR. RADIN: Let me get to that. The testimony regarding J.W. Dier is very important. We're asking the court to let it in under Rule 80324(sic). That's the catchall.

. . .

MR. RADIN: It's part of the story. Dier is one of those individuals. His name was brought to Mr. Rodriguez's attention by Vada Roberts, Hugh Riley, Ruth Ann Roundy, and Clayton Roundy.

THE COURT: What's Dier's full name?

MR. RADIN: J.W. Dier.

MR. MULLIGAN: James.

THE COURT: All right.

MR. RADIN: As a result of what these four witness said, Mr. Rodriguez in his department looked into Mr. Dier. *They checked his alibi. They spoke to him*

*directly. In fact, they tape-recorded that conversation.*

So we intend to ask Mr. Rodriguez, with your permission, whether there were other possible suspects. *Now, he may say, We eliminated him. And why? And that would be very proper for Mr. Kane [the prosecutor] to bring out.*

But we would like to ask Mr. Rodriguez if there were other possible suspects and *what they did or didn't do to investigate those other suspects.*

Dier was one of them. We have not made his name up. It came forward by the police and by these other individuals.

*Mr. McCandless, while he's on the stand, he was the one who actually checked the alibi. He's the one who actually interviewed Mr. Riley.*

*So I would like to ask him: As part of your investigation did you check into any other possible suspects including Mr. Dier?*

Yes.

What did you do?

Well, I did check on his alibi.

I don't want to get into hearsay, but I at least want to bring out that he was a possible suspect and the reasons why.

If you want to reconsider your other decision [regarding Betty Gray's statements], that's, of course, always up to you. But the point being that I just don't know how we can keep from the jury a possible suspect that was investigated by the sheriff's office itself. It's like not telling them the entire story.

If you look at Vada Roberts, if I could encourage you, I'm sure you'll read all of them, but Vada Roberts is very specific. It occurred just nine short months prior to her death. It's very detailed as to Reeda Roundy's concerns and the reasons for her concerns.

And like I said, he [the prosecutor] can bring out on cross the length of time. He can bring out that Mr. Dier was investigated. *He did have an alibi.*

They can bring all of this out. *We're not saying that he's the best suspect or that we can show that he committed the crime.*

But the *jury is entitled to know that that there were other suspects, that they were investigated by the sheriff's office, and why they were investigated.*

(Emphasis added.) [May 12 & 14 hearings]

To fill out this picture, here is part of the prosecutor's response to Gray's offer of proof.

**MR. KANE:** Finally, if I could make an offer of proof, we are prepared to prove and would prove that Mr. Dier was in a different state at the time the killings went down. I don't think [the evidence] is relevant for that reason.

[June 2, 1993]

I note here that Judge Wood's pre-trial hearsay relevancy ruling left the door open for Gray's counsel to pursue his attempt to show that Dyer was one of the other suspects. However, for tactical reasons, the defense did not take advantage of this opportunity. In explaining why during a motion for a new trial, the lack of probative value of this evidence again becomes apparent. I note also that Gray's counsel had the opportunity to call Dyer himself to the stand but decided not to do so. This is yet another reason that undercuts my colleagues claim that Gray was somehow not allowed to defend himself.

**MR. RADIN:** Now, I am fully aware and the court did tell the defense through counsel that we could mention the name of Mr. Dyer. We could have asked Detective Rodriguez if such a suspect existed, and expecting that he

would have been honest, he would have said, "Yes, we did have a suspect. We were ware of Mr. Dyer. His name did come up. We checked it out, and eventually we discounted him as a suspect."

But as defense strategy, Judge, we were obviously trying to convince the jury that aside from Mr. Gray there were other suspects. There's Mr. Hugh Riley, who was the lover of Mrs. Roundy, and there was Mr. LeRoy Leavitt, who was the lover of Mrs. Gray. And we had some testimony. Those gentlemen were here to testify.

To bring in Dyer and simply have him deny it, or have Rodriguez simply come in and say, "Yeah this guy existed. We checked him out, but it didn't come to anything," would have been in effect to have created a vacuum for the jury of facts, and it would have been like just kind of trying to throw out another little tidbit, and I think it would have taken away the effective aspect of our defense, well, you'd better take a hard look at LeRoy Leavitt, and you'd better take a hard look at Hugh Riley as alternate suspects.

But just to mention Dyer's name, I feel, would have done us no good. It would have been presented in a vacuum.

[Aug. 10, 1993]

The Dyer evidence was in my opinion a grasping attempt based on flimsy evidence to make something out of nothing. The idea that "Dyer did it" was rank speculation, clearly excludable as not probative. There is *no* other direct or circumstantial evidence adequately supporting or corroborating this view, to the contrary. Certainly no disrespect meant to trial counsel, but it was flak hearsay evidence. Shoot it into the air and maybe we'll get lucky and something will hit it. Judge Wood correctly pointed out the difficulty of deciphering one person's intentions and behavior,

Dyer's, from the statements of another, Roundy. Judge Wood was correct. On the other hand, the record was *loaded* with evidence that Betty Gray, not Reeda Roundy was the target of this killing.

Let me put it this way.

Of what relevance *at the trial* is the fact that X *was* a suspect, *until* it was discovered on investigation that he was dead at the time of the crime and could not have committed it? Of what relevance *at the trial* is the fact that X *was* a suspect, *until* it was discovered that he was in jail at the time of the murder? Similarly, of what relevance is it at *this* trial that X *was* a suspect, *until* it was discovered that he was out of state at the time of the murder? The obvious answer is that the fact that X *was* a suspect is not relevant because it proves nothing for the defense. He may have been a suspect, but he was cleared. It follows as night the day that having been eliminated as the murderer, *nothing* he said nine months earlier could be used to suggest that he might have committed the crime. So of what value under these circumstances was either the fact that he *was* a suspect or that nine months earlier, he said anything nasty about one of the victims? All *this* evidence does by *eliminating* one of the suspects is *increase* the probability that Gray was guilty.

Given these circumstances, because Dyer had a confirmed alibi which Gray's counsel acknowledged and did not dispute, any inference from the excluded statements that Dyer may have killed the women would have been absolutely misleading. Misleading evidence is not admissible any where in our system. If this is true, then the simple fact as pushed by Gray's attorney that Dyer was at one time a suspect, is clearly irrelevant. What does it prove? How does the fact that another suspect existed but that he was cleared help the defense. If anything, it *hurts* the defense.

The SODDIT defense (some-other-dude-did-it), of which this is a weak variant, in my experience of 23 years in the criminal courts only works when the evidence pointing to that dude is plausible. Here, it simply wasn't. In fact, Gray's counsel was obviously aware that the evidence was useless to show that Dyer was the killer. This explains why it was only offered to show "other suspects." Measured against the inculpatory eyewitness testimony and the other evidence of Gray's guilt, I believe this exclusion was resoundingly harmless. The jury was *not* going to believe that Dyer was the killer, the evidence that at one time he was a "suspect," but out-of-state when the murder happened, was irrelevant; and the excluded evidence viewed in the light of the rest of the case was not sufficient to raise a *reasonable* doubt based on the pointless claim that these were "other suspects." Given the verdict, the jury obviously credited Mackley's testimony putting Gray, not Dyer, in a position to kill his former wife and her friend.

In fact, a defense attorney can seriously *damage* his case when he suggests or insinuates or offers to prove without substantial evidence that someone other than the defendant committed the crime. When the prosecution then proves that the surrogate suspect is innocent, which it is certainly entitled to do, the loud backfiring that occurs tears a hole in the defense's credibility and strengthens the prosecution's case. This is what we have here-a desperate albeit understandable attempt by the defense to muddy the waters. This case may have been close, but the excluded evidence, *including* "the whole picture" of which it was necessarily a part, would not have made it any closer. In fact, it very well could have made it better for the State and *worse* for Gray.

If counsel had succeeded in convincing the judge to admit this evidence and then watched the prosecution demolish Dyer as a suspect, I'm sure it would have been now called blatant *Strickland* error on the ground that it hurt his client's defense. Opening this door allows the police to show what a thorough job they did, and that they eliminated other suspects. This hardly helps the defense. This concern is not as far-fetched as it might seem. Appellate counsel during the direct appeal to the Idaho courts accused trial counsel of numerous counts of constitutionally defective representation. Mr. Radin has already been put on trial. Moreover, in *Phillips v. Woodford,* 267 F.3d 966 (9th Cir.2001), we recently concluded that a defense attorney had provided ineffective assistance of counsel by *introducing* evidence of an alibi for his client, evidence suggested and vouched for by the client, under circumstances where the attorney should have known-given the rest of the evidence—that the alibi defense was "hopeless." Because the attorney harmed the defendant with a defective claim of alibi, we granted the defendant a new trial. It is not a great stretch to move from *Phillips* to this case where it appears that the defense attorney was attempting to use a SODDIT defense that was certain to fail because of a valid and unchallenged alibi. Defense lawyers in this circuit appear now to be *Strickland* damned if they don't, but also damned if they do.

### III

### Conclusion

Our circuit tends doggedly to repeat its mistakes in habeas cases even though we have been corrected many times by the Supreme Court. Indeed, it is not beyond the pale to say that we have been mildly castigated for abusing our habeas authori-

ty. Here is what the Court told us in 1991 in *Estelle v. McGuire:*

> We first consider whether the admission of the prior injury evidence justified habeas relief. In ruling that McGuire's due process rights were violated by the admission of the evidence, the Court of Appeals relied in part on its conclusion that the evidence was "incorrectly admitted ... pursuant to California law." *Id.,* [*McGuire v. Estelle,* 902 F.2d 749] at 754 [(9th Cir.1990)]. Such an inquiry, however, is no part of a federal court's habeas review of a state conviction. We have stated many times that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606, (1990); see also *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges,* 423 U.S. 19, 21 96 S.Ct. 175, 177, 46 L.Ed.2d 162 (1975) *(per curiam).* [N.2]

*Id.* 112 S.Ct. at 479–480 (footnote in original).

One can hardly miss the implications of the Court's references to *Lewis v. Jeffers* and to *Pulley v. Harris.* In those cases, we exceeded our authority and were reversed. Footnote 2 from this passage in *Estelle* is also instructive about another of our unsuccessful cases. It references *Blair v. McCarthy,* 881 F.2d 602 (9th Cir. 1989), *cert. granted,* 498 U.S. 807, 111 S.Ct. 39, 112 L.Ed.2d 16, *vacated as moot and remanded,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990) and says about that case, that "the court of Appeals based its grant of habeas relief solely on a ground of state law that prejudged the defendant. As our discussion above makes clear, such state-law violations provide no basis for federal habeas relief." 881 F.2d at 603–604.

We attempt to avoid this clear constitutional restriction, however, by claiming that the state-law violation we falsely perceive is so serious that it violates due process, and we do so even as here, when the state courts have definitively examined the issue under state law and declared that no state law violation or lapse has occurred. With all respect to my colleagues, not even legal legerdemain can accomplish such a result. To pull a rabbit out of a hat, the hat must contain a rabbit before the trick starts. Here, Gray's hat *has no rabbit,* but we pull one out of it at the State's unwarranted expense nevertheless. Dyer was not in there. With all respect to my colleagues I believe we have far exceeded our authority in ordering a new trial in this case based on the exclusion of irrelevant hearsay. In my respectful judgment, not only have we mistreated Idaho in refusing to apply the relevant habeas test and taking liberties with its handling of its evidentiary rules, but we have accomplished exactly what the Supreme Court warned against in *Brecht* when it noted that unnecessarily retrying old cases "imposes significant 'social costs' that, among other things, frustrate society's interest in the prompt administration of justice." *Id.,* 507 U.S. at 637, 113 S.Ct. 1710. Our order here simply orders a new trial at which it will be proved that Dyer could not have committed the murder, thus tightening the noose around Gray.

Thus, although I concur in the excellent remainder of Judge Berzon's opinion, I

respectfully dissent from the part that results in the granting of this petition.